Dorothy C. CAMDEN, Plaintiff,

v.

The STATE OF MARYLAND,
et al. Defendants.

Civil No. PJM 93–1854.

United States District Court,
D. Maryland,
Southern Division.

Jan. 24, 1996.

**1116**

Alvin I. Frederick, Rachel T. McGuckian, Eccleston & Wolf, Baltimore, MD, Joseph B. Chazen, Leslie A. Pladna, Mindy S. Kursban, Meyers, Billingsley, Shipley, Rodbell and Rosenbaum, Riverdale, MD, for plaintiff.

Dawna M. Cobb, Anne L. Donahue, Office of Attorney General, Baltimore, MD, for defendants.

## OPINION

MESSITTE, District Judge.

### I.

■ The Court holds that a lawyer representing a client in a matter may not, subject to few exceptions, have *ex parte* contact with the former employee of another party interested in the matter when the lawyer knows or should know that the former employee has been extensively exposed to confidential client information of the other interested party. As a rule, such *ex parte* contact may occur only with the consent of the other interested party's lawyer or approval of the court. "Other interested parties" for purposes of this standard include corporations and other organizations. Because the Court finds this rule to have been breached by Plaintiff's counsel in the present case with the consequence that confidential communications and documents were improperly obtained, the Court will grant Defendants' Motion to Strike the Testimony of Richard Redmond and to Disqualify Plaintiff's Counsel.

### II.

■ In this suit, Dorothy Camden has sued her former employer, Bowie State University (BSU), a public institution of higher learning located in Bowie. Camden, a former instructor at BSU, alleges that BSU discriminated against her on the basis of her race (white) and age (over 40) when she was discharged in 1992. When Camden first complained to BSU, it assigned the investigation to Richard Redmond, Special Assistant to the President of BSU for affirmative action programs, on loan from the U.S. Department of the Interior.[1]

---

1. Redmond was on loan to BSU pursuant to a special program whereby experienced affirmative action personnel of various federal agencies link up with other organizations to provide expertise that may otherwise be lacking. *See generally* Intergovernmental Personnel Act of 1970, 5 U.S.C.A. § 3371–3376 (West 1977 & Supp.1995). The salary of the specialist continues to be paid by his original agency, here, for example, by the Bureau of Land Management of the Department of the Interior. But in all other respects, the individual is subject to the direction and control of the organization to which he is providing services. Camden argues that, since Redmond was not an "employee" of BSU, there was no prohibition against her attorneys having *ex parte* contact with him in any respect. However, given the nature of the control that BSU exercised over Redmond, he was a *de facto* an employee for all intents and purposes. *See Black's Law Dictionary* 525 (6th ed. 1990) ("employee" is individual providing services to another who "has right to control and direct" work of individual). In any case, to the extent that Redmond functioned as an agent of BSU and came into possession of privileged information by reason of that status, he would still be covered by the privilege. *See, e.g., Carte Blanche (Singapore)*

John Dill, Provost and Vice President for Academic Affairs at BSU at the time, specifically advised Camden's lawyers, Meyers, Billingsley, Rodbell and Rosenbaum (MBRR),[2] that Redmond was the "principal contact person" at BSU that they should deal with regarding her case. As part of his duties, Redmond consulted with top BSU administrative officials and BSU's attorneys regarding the case and was actively involved in the sending and receiving of confidential communications, including assessments of Camden's claims and appraisals of the likelihood of their success.

At one point during the investigation, Joseph Chazen, a member of MBRR, sought to have *ex parte* contact with Redmond but John Anderson, an Assistant Attorney General of Maryland and BSU's attorney, objected. Chazen, according to Anderson, agreed to refrain from such contact.[3]

When Camden and BSU were unable to resolve their differences informally, Camden, represented by MBRR, initiated a complaint with the Equal Employment Opportunity Commission (EEOC). Redmond prepared and signed BSU's response to the complaint. When the EEOC, without investigating or determining the matter, issued its right to sue letter, Camden commenced this litigation represented, as before, by MBRR.

As it happens, Redmond himself came to a parting of the ways with BSU and his contract ended on less than amicable terms. In the course of discovery, however, BSU, responding to an interrogatory, identified Redmond as someone having knowledge of facts material to the case. Redmond was never deposed during the period the Court established for discovery and it remains unclear

whether he was contacted by counsel for either side during that period.

Redmond's first appearance in the lawsuit came as an affiant in support of Camden's Motion for Leave to File a Second Amended Complaint and for a Revised Scheduling Order. In his affidavit, Redmond, who had obviously been contacted by Camden's counsel by that time, unloaded something of a bombshell. According to Redmond, Provost Dill had told him apropos of the Camden case that a white woman should not be counseling black males. Moreover, Redmond stated that he had relayed this information to Dawna Cobb, an Assistant Attorney General representing BSU, but Cobb had "downplayed" its significance. Redmond's affidavit also implied that he was in possession of certain BSU documents pertinent to the Camden case.

When Cobb received Redmond's affidavit, she immediately wrote to Leslie Pladna, another MBRR attorney representing Camden, advising that, by virtue of Redmond's intimate involvement in the case on behalf of BSU, Defendants objected to MBRR's *ex parte* contact with him.[4] Cobb requested to be present during MBRR's future contacts with Redmond or that such contacts be subject to appropriate court order. She also demanded a copy of Pladna's notes based on the latter's conversations with Redmond, as well as copies of any and all documents Redmond might have given Pladna, indicating that Redmond might be in possession of documents he was not authorized to have. In response, Pladna refused to refrain from *ex parte* contact with Redmond, to seek a court order, or to supply a copy of her notes, but

---

PTE., Ltd. v. Diners Club Int'l, Inc., *130 F.R.D. 28 (S.D.N.Y.1990).*

**2.** The firm name as of that time was Meyers, Billingsley, Shipley, Curry, Rodbell and Rosenbaum, but for the sake of consistency, the firm will be referred to by its later name, MBRR.

**3.** Chazen says he is unable to remember any commitment made by him in this regard, but does not dispute that he may have made it. He says, however, that any such commitment on his part would have applied only to the pre-litiga-

tion, not the litigation, stage of the dispute. Other than to suggest that he hoped the case might settle, Chazen has not indicated why such a distinction would have been made by him nor why Anderson should reasonably have understood that there might be such a distinction.

**4.** Cobb, it should be noted, emphatically denies that Redmond ever reported to her any remark about a white woman counselling black males and Dill denies he ever made such a remark in the first place.

agreed to send Cobb a copy of all the documents Redmond had given to her.[5]

Cobb thereupon filed a Motion to Strike Redmond's Affidavit and to Disqualify MBRR from the case.[6]

At oral argument on the Motion, the Court determined that it would be helpful if the parties would schedule a special deposition of Redmond in order to establish precisely what he had disclosed in his discussion with Camden's attorneys. At the deposition, held soon after, Redmond indicated that he had in fact disclosed certain communications between himself and BSU's attorneys, as well as confidential communications prepared by or based on advice of counsel, including counsel's appraisal of the strength of Camden's case. The parties then filed supplemental briefs to the Court.

### III.

Judges and commentators have devoted a great deal of attention to the question of when, if ever, employees or former employees of an organization may be contacted by adverse counsel and, to the extent that they may, what may be asked of them.

■ Rule of Professional Conduct 4.2 provides the point of departure.[7] The rule pro-

hibits communication "about the subject of a lawyer's representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The comment to the rule suggests that it applies to at least a limited category of control group employees in an organizational setting. Thus the comment states that

> [i]n the case of an organization, this Rule prohibits communication by a lawyer for one party concerning the matter in representation with persons having managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.[8]

A number of authorities have suggested that the rule should not be expanded to include any other category of current employees or to include former employees at all. Applicable to Managerial Employees only: *See, e.g., Wright v. Group Health Hosp.*, 103 Wash.2d 192, 691 P.2d 564 (1984) (limiting no-contact rule to one in position of "manag-

---

**5.** At least one of these documents was clearly marked "confidential" as between Redmond and the top management of BSU and included specific references to communications with BSU's attorneys. Pladna indicates that, at least as of that time, she did not read the documents but merely "flipped through" them.

**6.** Although the Court denied MBRR's request for leave to file a Second Amended Complaint based on Redmond's testimony, that was because the proposed new pleading sought to add a new count for gender discrimination. The proposed testimony nevertheless would remain relevant for purposes of the previously pleaded racial discrimination count.

**7.** This Court applies the Rules of Professional Conduct as adopted by the Maryland Court of Appeals. Local Rule 704. Although the Maryland Court of Appeals has adopted Model Rule 4.2, it has never ruled on the question presently before this Court. Rule 4.2, it may be noted, is substantially identical to its predecessor in Maryland, Code of Professional Responsibility Rule 7–104(A)(1). Accordingly, courts interpreting Rule

4.2 have routinely cited case authority interpreting the earlier rule.

**8.** The parties have assumed that BSU enjoys whatever protections corporations and other organizations enjoy generally with regard to Rule 4.2, despite the fact that BSU as a public institution has at least a quasi-governmental character. Insofar as a party's right to speak with government officials about a controversy is concerned, Rule 4.2 has been uniformly interpreted to be inapplicable. *See* 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 4.2:109 (2d ed. Supps.1991 & 1994); Charles W. Wolfram, *Modern Legal Ethics* § 11.6.2 (1986). It is questionable whether the authorities had the case of a public educational institution in mind when they crafted this governmental agency exception, particularly where the institution finds itself in the more corporation-like stance of employer rather than its role of enforcer of governmental mandates. Even so, there is no doubt that governmental agencies may avail themselves of the attorney-client and work-product privileges, *see NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1975), and whatever rules a court might fashion to protect and preserve them.

ing-speaking" for organization); *see generally* John D. Hodson, Annotation, *Right of Attorney to Conduct Ex Parte Interviews With Corporate Party's Nonmanagement Employees,* 50 A.L.R.4th 652 (1986 & Supp. 1985); Not Applicable to Former Employees: *E.g. Wright,* 103 Wash.2d at 201, 691 P.2d at 569 ("former employees cannot possibly speak for the corporation"); *Curley v. Cumberland Farms, Inc.,* 134 F.R.D. 77 (D.N.J. 1991); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 91–359 (1991) (contact with former employee of adverse corporate party) (persuasive policy arguments can be made for extending rule to some former employees, but text and comment do not warrant it); Md.State Bar Ass'n Comm. on Ethics, Op. 86–13 (1986) (communication with non-lawyers: contact with former employee of corporate opposing party) (contact permitted); Md.State Bar Ass'n Comm. on Ethics, Op. 90–29 (1990) (same); *see generally* Susan J. Becker, *Conducting Informal Discovery of a Party's Former Employees: Legal and Ethical Concerns and Constraints,* 51 Md.L.Rev. 239 (1992) (contact recommended).

But other authorities have argued that the no-contact rule should be read to cover broader categories of current employees as well as extend to former employees. Applicable to more than just managers: *Niesig v. Team 1,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 498, 558 N.E.2d 1030, 1035 (1990) (rule prohibits communications with managers and any other person whose acts may be imputed to organization or constitute binding admission or employees implementing advice of counsel; but rule not applicable to former employees); Louis A. Stahl, *Ex Parte Interviews with Enterprise Employees: A Post-Upjohn Analysis,* 44 Wash & Lee L.Rev. 1181 (1987); Applicable to Former Employees: *Porter v. Arco Metals Co.,* 642 F.Supp. 1116, 1118 (D.Mont.1986); *Amarin Plastics, Inc. v. Maryland Cup Corp.,* 116 F.R.D. 36 (D.Mass.1987); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 658 F.2d 1355, 1361 n. 7 (9th Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982) (hereinafter *Petroleum Products*); *Bobele v. Superior Court,* 199 Cal.App.3d 708, 245 Cal.Rptr. 144 (1988); *Mills Land & Water Co. v. Golden West Refining Co.,* 186 Cal.App.3d 116, 230 Cal. Rptr. 461 (1986); Hazard & Hodes, *supra,* at § 4.2:107 (2d ed. Supp.1994); Samuel R. Miller & Angelo J. Calfo, *Ex Parte Contact With Employees and Former Employees of a Corporate Adversary,* 42 Bus.Law. 1053 (1987).

Determining which of these views should prevail (or in what combination) requires consideration of a legal concern separate from but closely related to Rule 4.2, namely the attorney-client privilege.[9]

In *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court held that the attorney-client privilege not only applies to corporations, but potentially to employees at all levels of the corporation. Thus:

> In the corporate context ... it will frequently be employees beyond the control group as defined by the court below— "officers and agents ... responsible for directing [the company's] actions in response to legal advice"—who will possess the information needed by the corporation's lawyers. Middle-level—and indeed lower-level—employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.... The attorney's advice will also frequently be more significant to noncontrol group members than to those who officially sanction the advice, and the control group test makes it more difficult to convey full and frank legal advice to the employees who

---

9. Although a federal court in a civil action follows state law on privileges when the action is premised on state law, federal common law on privileges applies with regard to federal actions. Fed.R.Evid. 501. In general the attorney-client privilege may be invoked with respect to (1) a communication; (2) made between a client and attorney; (3) in confidence; (4) for the purpose of facilitating the rendition of professional legal services to the client. *See* Proposed Fed.R.Evid. 503(b); *United States v. (Under Seal),* 748 F.2d 871 (4th Cir.1984).

will put into effect the client corporation's policy.

449 U.S. at 391–92, 101 S.Ct. at 683–84.

The purpose of the privilege, the Court noted:

> is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

449 U.S. at 389, 101 S.Ct. at 682.

The Court was explicit that the existence of the privilege does not necessarily preclude contact with employees; they may still be questioned as fact witnesses. 449 U.S. at 396, 101 S.Ct. at 686. In that sense, the decision dovetails with the reasons conventionally given for restricting the reach of Rule 4.2:

> the interest in informal and inexpensive access to information; the interest in facilitating compliance with rules (like Federal Civil Procedure Rule 11) that obligate lawyers to conduct factual investigations before filing complaints and other court papers; and (mainly in criminal cases) the interest in law enforcement.

Stephen Gillers, *Regulation of Lawyers: Problems of Law and Ethics* 93–94 (4th ed. 1995).

But in the widely cited *Niesig* case, the New York Court of Appeals, at least as to some employees, elevated concern for the objectives of the attorney-client privilege to the point of precluding contact with the employees altogether. Thus *Niesig* defined "party" within the no-contact provision of DR 7–104(A) to include "employees implementing the advice of counsel," 559 N.Y.S.2d at 498,

558 N.E.2d at 1035; *accord In re Opinion 668*, 134 N.J. 294, 633 A.2d 959, 962–3 (1993). Indeed, protection of information covered by the attorney-client privilege (as well as the work product privilege) has been traditionally cited as one of the prime objectives of the no-contact rule.[10] Clearly what *Niesig* did was to weigh the competing interests of the privilege and the no-contact rule and determine that where the employee implements the advice of counsel, a point is reached where the interest of the privilege trumps any interest in "informal and inexpensive access to information" and the like. At the same time, as *Upjohn* established, employees at all levels are potentially covered by the privilege, a holding *Niesig* in no way disturbed. Consistent with these principles, therefore, this Court concludes that whatever an employee's level in the organization, control group or otherwise, his role in implementing advice of counsel may be such that he is a candidate for inclusion in the no-contact rule. It remains to determine whether this rule should extend to former employees.

While the majority in *Upjohn* expressly declined to consider whether the attorney-client privilege extends to former employees since the matter had not been considered below, 449 U.S. at 394 n. 3, 101 S.Ct. at 685 n. 3, Chief Justice Burger, concurring, maintained that it should. 449 U.S. at 402–03, 101 S.Ct. at 689–90. In contrast, the *Niesig* court held that the no-contact rule does not apply to former employees. 559 N.Y.S.2d at 495, 558 N.E.2d at 1032. But the logic of extending both the privilege and the no-contact rule to at least some former employees seems irresistible.

■ Insofar as the attorney-client privilege is concerned, subject to few exceptions, it exists in perpetuity for the individual

---

10. It is said that [Rule 4.2] prevents the lawyer from:
1. getting a damaging admission from the opposing client;
2. learning a fact he or she would not learn if counsel were present to protect the opposing client;
3. settling or winning a concession in the matter without interference from opposing counsel;

4. learning information protected by the attorney-client privilege and the work-product privilege;
5. weakening the opposing client's resolve by casting doubt on the strength of his or her position; and
6. · disparaging the opposing lawyer to his or her client.

Gillers, *supra*, at 93.

client. *See* 8 *Wigmore on Evidence* § 2323 (McNaughton rev. 1961). An organization has no less interest in protecting its confidences when an employee who once shared those confidences leaves the company fold. *See, e.g., Petroleum Products,* 658 F.2d at 1361 n. 7 (attorney-client privilege served by certainty that conversations between attorney and client will remain privileged after employee leaves). Indeed, no court—including those that have blessed *ex parte* contact with former employees—has declared that such contacts permit invasion of confidential areas. Lawyers are cautioned to be scrupulous in avoiding such incursions. *E.g., Valassis v. Samelson,* 143 F.R.D. 118, 124–25 (E.D.Mich.1992); *In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. 556, 561–62 (N.D.Ga.1992); *see also* ABA Formal Opinion 91–359, *supra.*

But if the attorney-client privilege remains potentially applicable to all former employees, it must also be true that some former employees will have had dealings with organizational counsel equivalent to those that led the *Niesig* court to impose a no-contact rule when current employees are involved. Again, the organization's interest in policing highly probable incursions into confidential areas remains as strong the day after the affected employee leaves his job as the day before. Accordingly, a number of courts, contrary to *Niesig,* have relied on the *Upjohn* rationale to prohibit contact with former employees to one degree or another. *E.g., Petroleum Products,* 658 F.2d 1355 (9th Cir. 1981); *Mills Land & Water Co. v. Golden West Refining Co., supra.* Limitations have ranged from, in at least one instance, a flat prohibition against contacts with all former employees, *Public Serv. Elec. & Gas Co. v. Associated Elec. & Gas Ins. Servs., Ltd.,* 745 F.Supp. 1037 (D.N.J.1990), to a variety of limitations based on the particular circumstances of the case, *see, e.g., B.H. by Monahan v. Johnson,* 128 F.R.D. 659 (N.D.Ill. 1989).

But the best approach in the Court's view and the one it now adopts is that suggested by Preliminary Draft No. 10 of the Restatement of the Law Governing Lawyers. Restatement (Third) of the Law Governing Lawyers (Preliminary Draft No. 10, 1994).[11] Thus Section 159 of the proposed Restatement would include in the definition of a "represented person" within the meaning of its no-contact rule (§ 158), "with respect to an organization represented by a lawyer, a person connected with the organization: (1) who supervises, directs or regularly consults with a lawyer representing the organization concerning the matter."

This accords with and clarifies the holding of *Niesig.*[12]

But proposed § 162 of the Restatement goes beyond *Niesig* and would impose a no-contact rule with regard to "a person whom the lawyer knows to have been extensively exposed to relevant trade secrets, confidential client information, or similar confidential information of another party interested in the matter."

The rule, applicable to former as well as current employees, focuses not upon the individual's status as employee, but looks instead to the extent of the confidences shared. Its rationale is obvious. Where the risk of breaching protected areas is great, prophylactic provision must be made for monitoring. This can be accomplished if either organizational counsel is present to object or if the court has set appropriate ground rules in advance.[13] But what seems certain is that adversary counsel and the former employee himself (particularly given that he may har-

---

**11.** The Reporter for the draft Restatement is Professor Charles Wolfram of Cornell Law School, author of Wolfram, *Modern Legal Ethics, supra.* The preliminary draft has not been considered by the Council or membership of the American Law Institute, and therefore does not represent the position of the ALI on any of the issues with which it deals.

**12.** Compare *Niesig*'s reference to an employee "implementing the advice of counsel" with the proposed Restatement's employee who "super-

vises, directs, or regularly consults with a lawyer" concerning the matter.

**13.** For instances of court-imposed guidelines, *see PPG Indus., Inc. v. BASF Corp.,* 134 F.R.D. 118 (W.D.Pa.1990) (adversary lawyers directed to have employees read court order and to instruct them not to disclose privileged information); *University Patents, Inc. v. Kligman,* 737 F.Supp. 325 (E.D.Pa.1990).

bor hostility against his former employer) cannot be left to judge.[14] *Niesig*'s determination to exclude former employees from the no-contact rule is thus rejected, but its concern for relatively free and easy access to former employees is not. As Comment [d] to Proposed Rule 162 points out: "Only some persons exposed to a principal's confidential information will have been exposed to the extent stated." Former employees whose exposure has been less than extensive would still be available for *ex parte* interviews.

The rule of the draft Restatement is not merely the product of the draftsman's imagination nor does it require an interpretation of Rule 4.2 that strains to find that a former employee is a represented "party." Ample case authority supports limitations on contact with former employees who have had extensive exposure to privileged information. *See, e.g., Rentclub, Inc. v. Transamerica Rental Fin. Corp.,* 811 F.Supp. 651 (M.D.Fla.1992); *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.,* 764 F.Supp. 712 (D.Conn. 1991); *Chancellor v. Boeing Co.,* 678 F.Supp. 250 (D.Kan.1988); *Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037 (W.D.Mo. 1984); Hazard & Hodes, *supra,* at § 4.2:107 (Rule 4.2 violated where there is high risk former employee will disclose confidential information); *cf. Lang v. Superior Court,* 170 Ariz. 602, 826 P.2d 1228 (App.1992).

In addition, a separate source for the no-contact rule is the law of agency which prohibits an agent acquiring confidential information from a principal from sharing it with someone outside the principal-agent relationship when disclosure would impair substantial interests of the principal, a prohibition which holds both during employment, Restatement (Second) of Agency § 395 (1958), and after, *id.* at § 396.

What the proposed Restatement does, however, is to extract the organizing principle from these various authorities. Only insofar as a former employee has been *extensively* exposed to confidential information

and only insofar as an adversary attorney knows (or, it must be added, should reasonably know) of that fact, will *ex parte* contact be precluded. So long as privileged matters are respected, all other former employees remain fair game. This balancing of interests, in the Court's view, is both fair and reasonable.

The Court now applies that formulation in the present case.

## IV.

▮▮ MBRR represented Camden in her employment discrimination complaint from the outset—informally at first with BSU officials, formally thereafter before the EEOC and before this Court. Richard Redmond was the affirmative action coordinator at BSU responsible for handling the Camden case. He met with MBRR on BSU's behalf. He prepared reports on the case for BSU's top management and regularly discussed it with BSU's attorneys, engaging in strategy sessions and advising as to the strengths and weaknesses of both Camden's claims.

MBRR knew the extent of Redmond's involvement in the Camden matter by reason of his office and by more. BSU expressly identified Redmond to MBRR as the "principal contact person" to deal with at BSU regarding the case. John Anderson, BSU's attorney, expressly asked Joseph Chazen of MBRR to refrain from *ex parte* contact with Redmond and Chazen agreed. Redmond prepared and signed BSU's response to the EEOC complaint filed by MBRR on behalf of Camden. At the very least, MBRR had to be aware that Redmond was likely to have consulted to a substantial degree with BSU's attorneys and to have shared client confidences.

When MBRR finally contacted Redmond, they learned that he had departed BSU on unfriendly terms such that his care in guarding confidences might be lessened. MBRR apparently said nothing to Redmond about not disclosing those confidences; indeed that

---

**14.** There is another, perhaps more subtle, concern. If the confidential information divulged is of the sort that will never make its way into the court proceeding—for example, a confidential memo prepared by organizational counsel as-

sessing the strengths and weaknesses of their case or placing a monetary value on an opponent's case for settlement purposes—how will the transgression ever come to light?

is precisely what Redmond proceeded to do. MBRR showed little or no sensitivity to the situation, even citing in their Motion for Leave to File Second Amended Complaint the alleged reaction of BSU attorney Cobb to Redmond which, if true, at a minimum should have signalled a potentially privileged communication. MBRR then obtained confidential BSU documents which, if one accepts were not read by MBRR upon delivery (a difficult proposition), were certainly read in the course of preparing the motion for leave to file second amended complaint and in the broil and bubble of the present motions. The contents of those conversations and documents—whether or not useable in evidence—entered into and remain in MBRR's knowledge, with unknown effect upon their negotiating position or possible trial strategy.

There is, on review, little room for doubt. MBRR knew or should have known that Redmond was extensively exposed to confidential information of BSU, including regular contact with BSU's attorneys; they made no effort to protect those confidences; and they eventually came into possession of privileged conversations and documents. The Court concludes that the firm breached the standard of impermissible *ex parte* contact established in this case.

The final question is what should be done about it.

## V.

MBRR argues that there has been no real prejudice to Defendants and that the case should proceed without impediment. They further suggest that Plaintiff should not be made to suffer because of the possible missteps of counsel taken in a murky ethical area. Indeed, according to MBRR, the critical evidence regarding Provost Dill's purported statement, since it was purportedly not made in a privileged setting, would inevitably have been discoverable at a deposition upon appropriate notice. The Court cannot agree.

It may well be that Redmond's report of Dill's alleged discriminatory statement could have been obtained at a properly noticed deposition. It may also be true that Plaintiff herself is innocent of any wrongdoing in the matter. But to say that Defendants have not been prejudiced is not true. Discussions of utmost confidence going to the very core of the case have been listened in on by Plaintiff's counsel. Factual matters, strategy decisions, appraisals of the strength and weakness of Defendants' entire case have been exposed to review by the opposition. Documents clearly marked "confidential" dealing with these matters have been placed in the hands of opposing counsel. It is difficult to imagine a more direct assault upon confidential precincts.

Moreover, it is not Defendants alone who would be prejudiced if this action were left unredressed. The integrity of the justice system is at risk unless a stand is taken against conduct of the sort that occurred here. By Plaintiff's logic, unlimited invasions into privileged matters would be permissible so long as the client herself could not be implicated and so long as invading counsel promised not to use any privileged information that might come into their hands. That proposition, quite simply, is unacceptable.

Faced with gains ill gotten because of impermissible contacts with employees, courts have suppressed the evidence. *E.g., University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 329 (E.D.Pa.1990); *Papanicolaou v. Chase Manhattan Bank,* 720 F.Supp. 1080, 1085 (S.D.N.Y.1989); *Cagguila v. Wyeth Lab., Inc.,* 127 F.R.D. 653 (E.D.Pa.1989); *In re FMC Corp.,* 430 F.Supp. 1108 (S.D.W.Va. 1977). They have also, in more extreme circumstances, disqualified the attorney or firm that initiated the contact. *E.g. MMR/Wallace Power & Indus., Inc. v. Thames Assocs.,* 764 F.Supp. 712 (D.Conn. 1991); *Papanicolaou,* 720 F.Supp. at 1085– 87; *Shoney's, Inc. v. Lewis,* 875 S.W.2d 514 (Ky.1994).

The Court concludes that suppression of Redmond's affidavit, as well as any trial testimony by him, is an appropriate remedy in the present case. The time for discovery has closed; Defendants' Motion for Summary Judgment is on file. MBRR's own missteps cannot provide the basis for giving Camden the benefit of reopened discovery in order to sort out which components of Redmond's tes-

timony are privileged and which are not. His entire testimony will thus remain unavailable to Plaintiff in all phases of the case.

But it is not enough that Plaintiff be prevented from using Redmond's testimony in court. MBRR has listened in at the legal confessional. It has gained access to confidential information that is damaging to Defendants whether or not it becomes formal evidence in the case. MBRR has forever deprived BSU of obtaining a protective order that might have restricted their inquiry in the first place. Merely keeping undeniably confidential materials out of evidence cannot suffice since it would invite wholesale incursions into protected realms. Given the actions of MBRR in this case—in initiating *ex parte* contact with Redmond in the first place, in failing to take proper precautions regarding the disclosure of protected information by him, and ultimately because the knowledge they wrongly obtained can never be erased from their minds—the Court will grant Defendants' Motion to Disqualify MBRR from these proceedings.

The Court appreciates that this is a strong sanction in an area of law and ethics whose contours can only be described as blurry. But as noted in *University Patents, Inc. v. Kligman, supra:*

> The issue is not whether counsel incorrectly interpreted unsettled law, but whether [counsel] displayed an inappropriate disregard for the unsettled nature of that law.... [As] aptly stated in Cagguila, "In such an uncertain area of ethical conduct, we believe that a prudent attorney would have given notice to opposing counsel of the intent to take such a statement." *Cagguila*, 127 F.R.D. at 654.

737 F.Supp. at 329. *See also Faison v. Thornton*, 863 F.Supp. 1204, 1215–16 (D.Nev. 1993). Prudence required MBRR to act with comparable sensitivity in the present case.

A separate Order implementing this Opinion will issue.

### ORDER

Upon consideration of Defendants' Motion to Strike the Testimony of Richard Redmond and to Disqualify Plaintiff's Counsel, and Plaintiff's Opposition thereto, it is for the reasons set forth in the accompanying Opinion, this 24th day of January, 1996

ORDERED that said Motions are hereby GRANTED; and it is further

ORDERED that the testimony of Richard Redmond, in any and all forms, is hereby STRICKEN; and it is further

ORDERED that the law firm of Meyers, Billingsley, Rodbell and Rosenbaum and all individual attorneys therein, are hereby DISQUALIFIED as counsel for Plaintiff in these proceedings effective immediately, except that the firm may assist Plaintiff in attempting to arrange substitute counsel as promptly as possible.