**THE PLAN COMMITTEE IN THE DRIGGS REORGANIZATION CASE, Plaintiffs,**

v.

**John DRIGGS, et al., Defendants.**

No. JFM–97–1028.

United States District Court,
D. Maryland.

Feb. 18, 1998.

Daniel M. Litt, Dickstein, Shapiro & Morin, Washington, DC, for plaintiffs.

Nelson C. Cohen, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, DC, Bernard J. Casey, Francis P. Dicello, Reed,

Smith, Shaw & McClay, Washington, DC, Janet M. Nesse, David Strawbridge, Leonard C. Greenebaum, Washington, DC, for defendants.

## OPINION

MOTZ, Chief Judge.

This is an appeal from an order of the United States Bankruptcy Court for the District of Maryland, entered April 3, 1997. That order denied the motion of appellants John Driggs and Joanna Driggs ("Driggs") to disqualify counsel for appellees the Plan Committee in the Driggs Reorganization Case ("Plan Committee"), to suppress certain information and documents that counsel for the Plan Committee had obtained from Jeffrey M. Frost ("Frost"), former general counsel and vice president of the Driggs Corporation, and to dismiss the complaint. The essence of appellants' claim is that counsel for appellees violated ethical proscriptions by having ex parte communications with Frost, the substance of which form the basis of appellees' complaint in this action. For the reasons set forth below, the order of the bankruptcy court will be affirmed.

## I.

Appellant John Driggs filed a voluntary bankruptcy proceeding under Chapter 11 of the Bankruptcy Code on June 5, 1991. Driggs' Chapter 11 plan of reorganization was confirmed by the bankruptcy court on August 4, 1994. On February 21, 1997, the Plan Committee in the Driggs Reorganization Case filed an adversary proceeding against Driggs and other defendants,[1] alleging that they participated in transactions that resulted in fraudulent conveyances and the concealment of certain assets. It is that adversary proceeding that has led to this appeal.

In particular, the Plan Committee alleges that Driggs, as debtor-in-possession, wrongfully deprived his bankruptcy estate of assets and funds by orchestrating several transactions, including a pre-petition fraudulent conveyance of funds, a fraudulent and collusive post-petition sale of certain interests, and a fraudulent post-petition sale of property. The Plan Committee acknowledges that the basis for these allegations includes information and documents that it obtained from Jeffrey M. Frost, former general counsel and vice president of the Driggs Corporation. Frost met with counsel for the Plan Committee on two separate occasions, in May and September of 1996. Counsel for Driggs was not present during either of the meetings. The Plan Committee filed this case five months after the second meeting with Frost.

The history of the acrimonious relationship between Frost and Driggs that preceded Frost's disclosures to the Plan Committee is by now well known. It was set out in the proceedings before the bankruptcy court below, as well as in the opinion of Judge Davis in *Zachair, Ltd. v. Driggs,* 965 F.Supp. 741 (D.Md.1997), *appeal docketed,* No. 97–1811 (4th Cir. June 16, 1997).[2] Though oft-stated, that history remains no less remarkable and bears repeating once again.

Frost served as general counsel and vice president of the Driggs Corporation from 1987 to 1996; prior to that he represented John Driggs as outside counsel for fifteen years. In April, 1996 Driggs terminated Frost's employment, leading to a dispute over severance arrangements that Judge Davis described as "exceedingly hostile." *Id.* at 745. Frost demanded from Driggs close to $3 million in severance payments for his claimed physical and nonphysical injuries, which, in addition to a litany of medical ailments, included discrimination on the basis of his age and religion, and sexual harassment. When Frost's monetary demands were not met, he threatened "to ruin John Driggs by doing everything within my power, knowledge and information to destroy him with

---

1. Defendants named in the adversary proceeding are John Driggs and Joanna Driggs (the "Driggs defendants"), James M. Elliott, Ferry, Inc. and T. Grain, Inc. (the "Elliott defendants"), Morton A. Bender, Morton A. Bender, Inc., Driggs Building Systems, Inc., and Tidewater Associates Joint Venture.

2. During the pendency of that case, which involved antitrust and state law claims against defendant Driggs, Frost made disclosures to plaintiff's counsel similar to those at issue here. *See Zachair,* 965 F.Supp. at 746.

properly or improperly disclosed factual in-formation." *Id.* The disclosures to counsel for the Plan Committee and to counsel in *Zachair* followed.

Driggs responded by filing in the bank-ruptcy court a motion to disqualify counsel for the Plan Committee, and to suppress the information and documents that they had obtained from Frost. On April 3, 1997 the court denied the motion. In his ruling Judge Mannes described Frost as "an unsuccessful extortioner," whose conduct was motivated by "his dislike, spite, hatred, and desire to ruin Mr. Driggs after the payoff that he requested for his own pecuniary interest was denied." *See* Trans. of Hg. on M. to Disqual-ify Plan Committee Counsel, at 23 and 44. However, he nonetheless found that Frost's disclosures to the Plan Committee fell within the crime-fraud exception to the attorney-client privilege. *Id.* at 47. In addition, Judge Mannes found that there was no need for counsel for the Plan Committee to secure a prior judicial determination of the applica-bility of the exception before considering the information. *Id.* at 49. On April 25, 1997 the bankruptcy court certified an appeal to this court and stayed the adversary proceed-ing, and on June 11, 1997 this court granted appellants leave to appeal.

## II.

### A.

Driggs contends that counsel for the Plan Committee violated Maryland Rule of Profes-sional Conduct 4.2,[3] by engaging in ex parte communication with Frost without the pres-ence or consent of counsel for Driggs. Rule 4.2 provides that:

> In representing a client, a lawyer shall not communicate about the subject of the rep-resentation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The rule has consistently been interpreted to prevent a lawyer from contacting any current employee of an adverse organizational party. In *Camden v. State of Maryland,* 910 F.Supp. 1115 (D.Md.1996), Judge Messitte expanded this interpretation to prohibit counsel from contacting not just current em-ployees but also certain former employees of an adverse party. In *Camden,* plaintiff's at-torney in a race discrimination suit had ex parte contacts with an affirmative action spe-cialist formerly employed by a university that had allegedly discriminated against the plaintiff. Before leaving the university, the specialist headed its investigation of plain-tiff's claims. In granting defendant's motion to strike the testimony of the specialist and to disqualify plaintiff's counsel, Judge Mes-sitte held that, under Rule 4.2, "a lawyer representing a client in a matter may not, subject to a few exceptions, have ex parte contact with the *former employee* of another party interested in the matter when the law-yer knows or should know that the former employee has been extensively exposed to confidential client information of the other interested party." *Id.* at 1116 (emphasis added). The two narrow exceptions identi-fied by the court that allow such ex parte contact with former employees are either the consent of the other interested party's law-yer or the approval of the court. *Id.*

More recently, in *Zachair,* Judge Davis applied Rule 4.2 to disclosures by Frost simi-lar to those at issue here. That case in-volved antitrust and state law claims against defendant Driggs, arising out of a dispute over a tract of land containing a sand and gravel business. While the suit was pending, Frost engaged in a seven hour informal in-terview with counsel for the plaintiff. *Za-chair,* 965 F.Supp. at 746. The court held that, under the interpretation of Rule 4.2 enunciated in *Camden,* Zachair's counsel vio-lated the Rule by conducting the day-long, transcribed interview with Frost. *Id.* at 753. Judge Davis based his conclusion on the fact that, since "Zachair's counsel was well aware that Frost had served ... as general counsel to the Driggs defendants," counsel "knew, or should have known, that Frost had been

---

**3.** The Maryland Lawyers' Rules of Professional Conduct are set forth as an Appendix to Mary- land Rule 16–812 (1997).

extensively exposed to confidential information" concerning the defendants. *Id.*

However, in *Davidson Supply Co., Inc. v. P.P.E., Inc.*, 986 F.Supp. 956, (D.Md.1997), Judge Smalkin rejected the interpretation of Rule 4.2 adopted by Judges Messitte and Davis. In that case plaintiff, a marketer of beauty supplies, alleged that two of its former employees (Louge and Edwards) violated the Electronic Communications Privacy Act of 1986. A day before the complaint was dismissed as to defendant Edwards, plaintiff's counsel met with Edwards and entered into a settlement agreement and release which required her to cooperate with the plaintiff in pursuing its claims against the remaining defendants. The remaining defendants filed a joint motion to disqualify plaintiff's counsel and suppress wrongfully obtained evidence. In denying the motion, Judge Smalkin "disagree[d] with the proposition that Rule 4.2 should be interpreted by this Court differently from the interpretation given to it by the Maryland State Bar Association," to reach ex parte contact with the former employee of a party who was exposed to confidential information of the employer. *Id.* Such an expansive interpretation, Judge Smalkin reasoned, "should be made by a duly promulgated amendment to the rule itself, rather than by the gloss of caselaw." *Id.*

### B.

▮ I need not reconcile or choose between the contradictory positions taken by Judges Messitte and Davis, on the one hand, and Judge Smalkin, on the other. I conclude, as did Judge Smalkin in *Davidson Supply*, that defendants' motion to dismiss, suppress and disqualify should be denied, but in doing so I find that the *Camden* and *Zachair* cases decided by Judges Messitte and Davis are distinguishable. I am being cautious in my approach because I recognize that the area of contacts with former employ-

ees is a veritable minefield in which, until it is cleared by authoritative interpretation of Rule 4.2 by the Maryland Court of Appeals (or at least collegial consideration of the issues by the Fourth Circuit or the District Court), short and tentative steps are the most appropriate.[4]

The clearest factor distinguishing this case from *Camden* is Frost's status as Driggs' former general counsel. At first blush this may seem to make the contacts with Frost by the Plan Committee more egregious than the contacts involved in *Camden*, as it may seem paradoxical that contacts with an adversary's former lawyer—who by nature of the relationship was privy to confidential and privileged information—should be deemed permitted under Rule 4.2 while contacts with other former employees are not. However, three considerations weigh in favor of this conclusion. First, one of the purposes of Rule 4.2, as interpreted to cover former employees, is to prevent lawyers from taking advantage of lay witnesses who are unfamiliar with their rights and duties to their former employer under the law. By definition this purpose need not be served when the former employee is herself a lawyer. Second, if a former lawyer discloses confidences to an attorney representing an adverse party, she herself is subject to disciplinary sanction. *See* Maryland Lawyers' Rule of Professional Conduct 1.9(b)(1997).[5] The potential threat of the institution of such proceedings provides a strong deterrent against the unauthorized disclosures that Rule 4.2 itself is designed to prevent. Third, Rule 4.2 permits a contact with a former employee if the contact is "authorized by law." Rule 1.6(b), in turn, provides that an attorney may reveal information relating to the representation of a client "to the extent that a lawyer reasonably believes necessary ... to rectify the consequences of a client's criminal or fraudulent act in furtherance of which the lawyer's

---

**4.** *Zachair* is presently pending before the Fourth Circuit. Perhaps the Court will certify to the Maryland Court of Appeals the question of the scope of permissible contacts with former employees under Rule 4.2, since issues relating to the professional responsibilities of attorneys traditionally are considered to fall within the province of State authorities.

**5.** Rule 1.9 stipulates that "a lawyer who has formerly represented a client in a matter shall not thereafter ... (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

services were used." At least arguably, this provision constitutes an "authorization by law" for Frost's disclosures, bringing those disclosures within the exception to Rule 4.2.

Although Frost's status as a lawyer distinguishes this case from *Camden*, it does not distinguish the case from *Zachair*, which involved contacts with and disclosures by Frost himself. The context of *Zachair*, however, was far different from the context here. There was no finding in *Zachair*, similar to the one made by Judge Mannes in the present case, that the disclosures made by Frost related to underlying fraudulent conduct. Moreover, in *Zachair* Frost was originally named as a party defendant. After dismissing the claims against Frost, plaintiff's counsel apparently approached him, soliciting information that he could provide against his co-defendants, including his former clients. By contrast, in the present case it was Frost who, entirely on his own, approached counsel for the Plan Committee, volunteering to provide information concerning Driggs' allegedly fraudulent activities. Recognizing their fiduciary obligation to the creditors of the estate, counsel heard Frost out. They did not disguise the fact that Frost was speaking with them, and it is undisputed that counsel for Driggs knew what Frost was doing. Further, Plan Committee counsel did not simply take Frost at his word but sought to corroborate what he said before instituting the adversary proceeding. When they did file the proceeding, they did so under seal.

Driggs attacks counsel for the Plan Committee for not having sought permission from Judge Mannes to interview Frost. In my judgment it would have been more prudent for them to have done so. Judge Mannes may well have entertained a request for an ex parte communication with Frost since the ongoing Chapter 11 proceedings were pending before him. However, the Bankruptcy Rules do not require such a request, and when Judge Mannes was later advised that Plan Committee counsel had interviewed Frost without his prior permission, Judge Mannes ruled there was no requirement that counsel have come to him in the first instance.

While perhaps counterintuitive, that ruling was correct. *Zachair* had not yet been decided when counsel for the Plan Committee had their contacts with Frost, and the only direct authority that Driggs cites to support his contention that Plan Committee counsel should have known they were required to obtain court approval before interviewing Frost was Judge Messitte's opinion in *Camden*. That opinion is thoughtful and worthy of respect, and counsel should have been aware of it when embarking upon such a serious and delicate venture as accepting information from former general counsel. However, as indicated above, *Camden* is not "on all fours" with this case and, in any event, is not binding upon the Bankruptcy Court and the District Court as a whole.

█ Other cases cited by Driggs involving the crime/fraud exception to the attorney client privilege are not apposite. *See, e.g., United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); *United States v. Edgar*, 82 F.3d 499 (1st Cir.1996); *United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F.Supp. 1243 (D.Md. 1995). Although in such cases court orders are required to accomplish disclosures, this is so not because judicial oversight of attorney disclosures is always required but because of the manner in which the crime/fraud issues are presented for resolution. Ordinarily the party seeking disclosure must obtain an order compelling disclosure because another party (or witness) has refused to provide testimony or produce documents by asserting the attorney/client privilege. Obviously, that is not the situation here, since Frost was voluntarily making disclosures to counsel for the Plan Committee. That fact was known to Driggs, who could have (but chose not to) file an action seeking to enjoin the disclosures. *See, e.g., X Corp. v. Doe*, 805 F.Supp. 1298 (E.D.Va.1992).[6]

---

6. I should note that an implicit premise of my holding is that Frost's disclosures were proper under Rule 1.6(b). This premise is based upon Judge Mannes' finding that the disclosures were proper under the crime/fraud exception to the attorney/client privilege. Technically, however, this finding may not be sufficient. As pointed out (with great analytical skill) by Judge Ellis in *X Corp. v. Doe, supra*, there is a distinction between the evidentiary attorney/client privilege

## C.

█ For these reasons I conclude that counsel for the Plan Committee did not act improperly in interviewing Frost and obtaining information from him. Even if, however, I am incorrect in this conclusion, the appropriate remedy for any ethical violation that occurred would be disciplinary action against Frost (and perhaps counsel for the Plan Committee), not dismissal of the adversary proceeding, suppression of evidence, or disqualification of counsel. If the allegations in the complaint in the adversary proceeding are true, defendants have been guilty of substantial frauds committed against the bankruptcy estate and Driggs' creditors. Moreover, although he did so after-the-fact rather than before as arguably was required, Judge Mannes has found that as a substantive matter Frost's disclosures were proper. Against this background defendants should not be absolved of their alleged wrongdoing by dismissal of the complaint or the suppression of evidence because counsel for the Plan Committee made a misjudgment on issues that are far from clear. Nor is disqualification of Plan Committee counsel required since they have not been "tainted" by receipt of any information that would not be, in light of Judge Mannes' findings, equally available to any successor counsel.

and the confidentiality provisions of the Code of Professional Ethics. *Id.* at 1304–10. Because "the privilege arises in the context of litigation and is therefore subject to the discipline of the adversary process and the safeguard of judicial scrutiny," *id.* at 1309, the party seeking to overcome the privilege by way of the crime/fraud exception typically has a lesser burden of proof than does an attorney who seeks to justify having disclosed the confidences of a former client.

Under this analysis what Judge Mannes should have resolved when deciding defendants' motion was *not whether Frost's disclosures came within the crime/fraud exception to the attorney/client privilege but whether they were warranted under the higher standard arguably established by Rule 1.6(b). Defendants have not, however, raised this issue,* apparently conceding that Judge Mannes' findings as to the crime/fraud exception are sufficiently broad to cover the propriety of the disclosures under Rule 1.6(b) as well.