**ZACHAIR, LTD., Plaintiff,**

v.

**John A. DRIGGS, The Driggs Corporation, Southern Maryland Sand and Gravel Corporation, Washington Executive Airpark Limited Partnership, Washington Executive Airpark, Inc., Cecil Sand & Gravel, Inc., Jeffrey M. Frost, Charles Shapiro and Bruce Jaffe, Defendants.**

**Civil No. AMD 96–2364.**

United States District Court, D. Maryland.

June 3, 1997.

Roger C. Simmons, Gordon & Simmons, Frederick, MD, for plaintiff.

Leonard C. Greenebaum, Shelby F. Mitchell, Lee H. Simowitz, Baker & Hostetler, Washington, DC, College Park, MD, Irwin H. Liptz, Harlan L. Weiss, Kivitz & Liptz, LLC, Chevy Chase, MD, for defendants.

DAVIS, District Judge.

Plaintiff Zachair, Ltd. ("Zachair") filed a multi-count complaint against John A. Driggs, The Driggs Corporation, Southern Maryland Sand and Gravel Corporation ("SMS & G"), Washington Executive Airpark Limited Partnership ("WEALP"), Washington Executive Airpark, Inc., ("Airpark"), and Cecil Sand & Gravel ("CS & G"), collectively termed "the Driggs defendants"; and Charles Shapiro and Bruce Jaffe, together termed the "additional bid-rigging defendants." Zachair alleges that the defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to prevent Zachair from operating a sand and gravel business on property that defendant WEALP previously owned and John A. Driggs controlled. Plaintiff also alleges myriad state law claims. Pending before the Court are motions under Fed.R.Civ.P. 12(b)(6) to dismiss for failure to state a claim upon which relief may be granted filed by the Driggs defendants, defendant Shapiro, and defendant Jaffe, and a motion by the Driggs defendants to disqualify Zachair's counsel and suppress wrongfully obtained material, which is based on allegations that plaintiff's attorney violated ethical proscriptions when he arranged to have *ex parte* contact with those defendants' former general counsel. For the reasons discussed below, I shall dismiss with prejudice the federal antitrust claims, and as a consequence, Zachair's pendent state law claims shall be dismissed without prejudice. Moreover, to facilitate complete appellate review should plaintiff note an appeal from my Order, I shall grant the Driggs defendants' motion to disqualify Zachair's counsel and suppress wrongfully obtained material.

I

In 1988, WEALP purchased a tract of real property located in Prince George's County, Maryland ("the property"), and began to operate a surface sand and gravel mining facility. Compl. ¶ 16. Airpark, WEALP's general partner, operated an airport on a portion of the property.[1] *Id.* ¶¶ 16–17. John A. Driggs controls the business affairs of all the

---

1. In June 1989, SMS & G replaced Airpark as WEALP's general partner, and in December 1992, Airpark replaced SMS & G and again became WEALP's general partner.

Driggs defendants. *Id.* ¶ 2. Indeed, the Driggs defendants all share the same principal place of business in Capitol Heights, Maryland, and are represented by the same counsel in this case. *Id.* ¶¶ 2–8. Effectively, John A. Driggs operated the entire sand and gravel mining enterprise and the airport through the exercise of control over his numerous affiliates.

In time, WEALP defaulted on both its real estate tax and loan payments, including a NationsBank loan secured by deeds of trust and a purchase money loan from the seller, W.A. Albright Investments, Inc. ("Albright"), which was also secured by a deed of trust. *Id.* ¶¶ 21–22. On October 1, 1992, NationsBank obtained a judgment against WEALP. *Id.* In April 1993, an involuntary bankruptcy petition was filed against WEALP, and WEALP subsequently converted the case into a voluntary Chapter 11 filing. *Id.* ¶ 25.

WEALP remained in default on its loan obligations, and NationsBank and Albright eventually petitioned the bankruptcy court to lift the automatic stay so that the creditors could foreclose on the property. *Id.* ¶ 26(a). On July 27, 1994, the court lifted the stay, permitting foreclosure proceedings to commence. *Id.* In September 1994, Zachair purchased the NationsBank and Albright notes. *Id.* 26(b). Thereafter, WEALP filed several "objectively baseless" motions, and an appeal, to protect its possession of the property, including: (1) a motion to stay the Lift Stay Order; (2) an appeal of the bankruptcy court's denial of the motion to stay; (3) a motion to stay pending appeal; and (4) a motion for approval of a supersedeas bond. All of Zachair's motions were unavailing. *Id.* ¶¶ 26(c)–(g).

On November 3, 1994, a foreclosure sale was held on the property. *Id.* ¶ 28. John A. Driggs instructed Jeffrey M. Frost, Esq., to attend the foreclosure. *Id.* Among other positions, Frost served as general counsel and vice-president to the Driggs Corporation and to some of the various entities controlled by or affiliated with John A. Driggs and the

Driggs Corporation. *Id.* ¶ 8. John A. Driggs also instructed Bruce Jaffe and Charles Shapiro, the "bid-rigging defendants" whose significance to this case remains something of a mystery,[2] to attend the foreclosure auction. *Id.* ¶ 28. Frost and Jaffe presented $75,000 in certified funds in order to qualify for bidding. *Id.* Frost's certified check was drawn from a Driggs Corporation bank account. *Id.* ¶ 29. However, "neither Jaffe, Shapiro nor Frost ever intended to bid on the [p]roperty, but merely pretended to [intend to] bid in order to provide Driggs with an excuse to challenge the foreclosure sale..... Each had been contacted directly or indirectly by Driggs who asked them to attend the sale and pretend to be bidders." *Id.* ¶ 30. In fact, none of the defendants bid on the property, and Zachair successfully bid on the property.

After the foreclosure sale, the trustees under the Albright deed of trust requested that the defendants remit revenues to the trustees while the sale's ratification was pending, but the defendants failed to remit those payments and, according to Zachair, still have neglected to remit the payments which accrued over a five month period before Zachair finally obtained possession of the property from the Driggs defendants. *Id.* ¶ 33(a). On November 15, 1994, Frost entered his appearance in the foreclosure action "both as an agent for an undisclosed principal (an unsuccessful bidder) and also as counsel for Driggs Corp." *Id.* ¶ 33(b). On November 18, 1994, counsel for WEALP entered his appearance in the foreclosure action. *Id.* On December 6, 1994, the day before the deadline to protest ratification of the foreclosure, WEALP filed "objectively baseless" exceptions to the foreclosure sale. *Id.* ¶ 33(c). Driggs Corporation also attempted to file exceptions, but because they were untimely, the court dismissed them at a hearing held on January 30, 1995. *Id.* The court issued an order on February 3, 1995, ratifying the foreclosure sale and awarding possession of the property to Zachair. *Id.* Despite the ratification, Driggs Corporation, WEALP,

---

**2.** Zachair's complaint provides no indication as to the relationship between Jaffe, Shapiro, and the other defendants. Jaffe and Shapiro do not share the same place of business, nor do they share the place of business of the other defendants. In short, Zachair offers no information explaining who Jaffe and Shapiro are, other than alleged co-conspirators in a bid-rigging scheme.

and Airpark refused to vacate the property and continued to conduct mining and airport operations. *Id.* ¶ 33(d).

Without filing a supersedeas bond, Driggs Corporation, WEALP, and Frost appealed the ratification of the foreclosure sale. *Id.* ¶ 33(e). The Albright trustees and Zachair thereafter requested an injunction to prevent the defendants from depleting the mineral resources on the property. *Id.* ¶ 33(f). On March 1, 1995, the court granted an *ex parte* injunction, subject to a March 7 hearing on interlocutory relief. *Id.* At the March 7 hearing, the court denied Zachair's request for an interlocutory injunction in light of Driggs Corporation's offer to pay royalties to the trustees. *Id.*

As the defendants still had not vacated the property, the trustees requested a writ of possession, which the court issued on March 13, 1995. *Id.* ¶ 33(g). On March 17, 1995, the date scheduled for the eviction, Driggs Corporation filed an emergency motion to stay the eviction and the court granted Driggs Corporation seven days in which to post a supersedeas bond. *Id.* ¶ 33(h). Driggs Corporation also filed a motion to stay the execution of the writ of possession and to reduce the amount of the supersedeas bond. *Id.* ¶ 33(i). The court granted Driggs Corporation's motion on March 23, 1995, but on March 28, 1995, the court set aside the March 23 Order. *Id.* The defendants were evicted on March 29, 1995. *Id.* ¶ 33(j).

Immediately following the eviction, Frost, then "wearing the hat" of general partner of WEALP, attempted to withdraw WEALP's previously submitted special exception application, which was pending before Prince George's County officials and which, if approved, would have allowed the property to be used for mining operations beyond July 1997. *Id.* ¶ 34(a). While the rights under the special exception application belonged to Zachair as the property owner, Frost based his protest on the "objectively baseless" theory that WEALP remained the "record owner" of the property. *Id.* Local citizens, encouraged by the defendants, opposed Zachair's efforts to obtain a new special exception. *Id.* However, WEALP's request to withdraw its application was denied on Sep-

tember 19, 1995, because WEALP lacked an ownership interest in the property. *Id.* ¶ 34(b).

Meanwhile, SMS & G would not agree to transfer its surface mining permit, which SMS & G obtained from the Maryland Department of Natural Resources in 1991, to Silver Hill, Zachair's lessee. *Id.* ¶ 34(c). As a consequence, Silver Hill's application for a transfer of the SMS & G surface mining permit was denied on October 2, 1995. *Id.* Zachair requested a hearing on the denial of the surface mining permit, and the request was denied. *Id.* ¶ 34(d). Zachair thereafter filed a suit for a declaratory judgment, seeking to reverse the denial. *Id.* Ultimately, Zachair obtained the right to use SMS & G's surface mining permit.

In April 1996, shortly after the defendants were evicted from the property, John A. Driggs terminated Frost as general counsel. Def. Motion to Disqual. p. 2. Frost had served in various official capacities to John A. Driggs and his affiliates for more than nine years. Perhaps not surprisingly, the breakup was exceedingly hostile, resulting in Frost's explicit threat to "ruin John Driggs by doing everything within my power, knowledge and information to destroy him with properly or improperly disclosed factual information." Def. Motion to Disqual., Exh. B. Frost was originally named as a defendant in this case. Compl. ¶ 8. After Zachair filed its complaint on July 29, 1996, and before the defendants' answer was due, Zachair's counsel engaged in negotiations with Frost whereby counsel offered to dismiss Frost as a defendant in exchange for Frost's promise to "discuss th[e] case ... informally" with Zachair's counsel. Def. Motion to Disqual., Exh. D.; *see also* Pl. Opp. to Motion to Disqual. pp. 2–3. Indeed, plaintiff's counsel apparently offered to "indemnify[ ]" Frost in return for Frost's assistance. Def. Motion to Disqual., Exh. D. The plaintiff voluntarily dismissed Frost as a defendant on September 17, 1996. Pl. Opp. to Motion to Disqual. p. 3.

Upon learning of the negotiations between Frost and Zachair's counsel, the Driggs defendants' counsel forwarded correspondence to Zachair's counsel invoking the attorney-

client privilege on behalf of their clients with respect to any confidential information Frost might reveal. Def. Motion to Disqual., Exh. E. Nonetheless, Zachair's counsel noticed Frost's deposition for October 3, 1996, at 9:30 a.m. Def. Motion to Disqual., Exh. F. On September 23, 1996, the defendants filed the pending motion to dismiss Zachair's complaint for failure to state a claim. Two days later, on September 25, 1996, Frost wrote to Zachair's counsel and requested to speak with him "without the Defendants' counsel for approximately an hour before the deposition begins." Def. Motion to Disqual., Exh. G. Zachair's counsel declined the defendants' request to postpone Frost's deposition until after the Court had ruled on the motion to dismiss, and consequently the defendants filed a motion for a protective order to forestall Frost's deposition. Pl. Opp. to Motion to Disqual. p. 3.

On October 2, 1996, in response to a telephone inquiry concerning the motion to stay the deposition, my chambers informed defendants' counsel that, under Local Rule 104, Frost's deposition was premature in any event and therefore impermissible. (Apparently in the hustle and bustle of the moment, none of counsel studied this Court's Local Rules and elected instead to exchange motion papers and correspondence.) Defendants' counsel attempted to relay this information to Zachair's counsel, but Zachair's counsel could not be reached. On the morning of October 3, 1996, prior to the scheduled commencement of Frost's improperly-noticed deposition, a secretary to one of defense counsel spoke directly with Zachair's counsel and informed him that under Local Rule 104 he could not commence the deposition. Def. Motion to Disqual. Exh. J; Pl. Opp. to Motion to Disqual. p. 4. Zachair's counsel responded that he would proceed with Frost's deposition unless he received contrary instructions directly from this Court. Def. Motion to Disqual., Exh. J. After the secretary conveyed counsel's remarks to the defendants' counsel, defendants' counsel repeatedly attempted to contact Zachair's counsel by telephone, but defendants' counsel could not reach Zachair's counsel. Def. Motion to Disqual., Exh. I.

Later that afternoon, the Driggs defendants' counsel sent a facsimile to Zachair's counsel indicating that the defendants intended to seek judicial intervention absent assurances from Zachair's counsel that he had not proceeded to depose Frost or obtain any confidential information from Frost. Def. Motion to Disqual., Exh. K. That same afternoon, Zachair's counsel sent a facsimile to the defendants' counsel stating that "I am not taking the deposition of Jeffrey Frost." Def. Motion to Disqual., Exh. L. What Zachair's counsel did take from Frost, however, was a transcribed "informal interview" that, including breaks, lasted seven hours. The defendants subsequently filed a motion to disqualify Zachair's counsel and suppress wrongfully obtained material. I held a hearing on all open motions, and ordered that a transcript of the *ex parte* communication between Frost and Zachair's counsel be submitted to the Court for *in camera* review, and it has been lodged with the Clerk under seal solely for examination by an appellate court in the event there is an appeal of my Order in this case.

## II

▮ I must view the defendants' motions to dismiss with a forgiving eye, mindful that such motions are "granted sparingly and with caution in order to make certain that plaintiff is not improperly denied a right to have his claim adjudicated on the merits." 5A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, CIVIL 2D § 1349 at 192–93 (1990); *see Conley v. Gibson*, 355 U.S. 41, 45—46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Thus, for purposes of ruling on the motions, I must accept as true the plaintiff's well-plead factual allegations and must construe those allegations in the light most favorable to the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). However, "[w]hen confronted with a motion to dismiss a Sherman Act § 1 complaint," the district court must "determine whether 'allegations covering all the elements that comprise the theory for relief' have been stated as required." *Estate Const. Co. v. Miller &*

*Smith Holding Co., Inc.,* 14 F.3d 213, 220 (4th Cir.1994) (quoting *United States v. Employing Plasterers Ass'n,* 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954)). While a district court should assume that plaintiffs "can prove the facts that they allege in their complaint," *Estate Const. Co.,* 14 F.3d at 221, the court will not "assume that plaintiffs can prove facts that they have not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983).

(i)

█ Applying these precepts, I am persuaded that, as a matter of law, Count I of Zachair's complaint fails to state a claim upon which relief can be granted. In Count I, Zachair has attempted to plead a *per se* violation of § 1 based on bid-rigging. Bid-rigging violative of § 1 contemplates agreements between actual or potential competitors. *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 325 (4th Cir.1982); *United States v. W.F. Brinkley & Son Constr. Co.,* 783 F.2d 1157, 1160 (4th Cir. 1986); *United States v. Ashland–Warren,* 537 F.Supp. 433, 445 (M.D.Tenn.1982) (finding that bid-rigging schemes are useless unless the offending group consists of competitors) (criminal prosecution). Stated another way, "courts have only deemed bid rigging a *per se* violation where the agreements have been horizontal." *MHB Distributors, Inc. v. Parker Hannifin Corp.,* 800 F.Supp. 1265, 1268 (E.D.Pa.1992); *Advanced Power Systems v. Hi–Tech Systems,* 801 F.Supp. 1450, 1463 (E.D.Pa.1992); *see Business Electronics v. Sharp Electronics,* 485 U.S. 717, 730, 108 S.Ct. 1515, 1522–23, 99 L.Ed.2d 808 (1988) (finding that competitor-imposed restraints are horizontal, while restraints imposed by agreement between firms at different levels of distribution are vertical). Zachair has not alleged facts that would show directly or support the inference that any of the defen-

dants are, *inter esse,* actual or potential competitors, or competitors of Zachair in the sand and gravel market. In short, there is no evidence of a horizontal relationship among the parties. Zachair's assertion that the defendants are competitors as prospective landowners who "would have entered into a royalty contract with a mining concern," Pl. Opp. to Motion to Dismiss Compl. p. 8, rather than competitors in the sand and gravel business, not only contradicts the complaint, it is nonsensical.[3] Thus, because Zachair has failed to allege, as an initial matter, any facts supportive of an inference that the defendants are competitors, Zachair's bid-rigging claim is legally insufficient on its face.

█ Moreover, even assuming the defendants are actual or potential competitors, there is no allegation that the defendants reached a prohibited agreement. Bid-rigging occurs when competitors agree to submit identified offers to, and/or withhold offers from, a third party. *See United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 325 (4th Cir.1982). At bottom, even viewed in the light most favorable to Zachair, the allegations here are merely that some of the defendants attended the foreclosure auction with no genuine intent to bid; Zachair has not alleged that the defendants intended to bid, submitted anticompetitive bids, or that they bid at all. Absent a basis upon which a rational jury could infer that the defendants agreed, combined, or conspired to engage in bid-rigging, Zachair cannot satisfy the linchpin of any § 1 claim, namely, that a prohibited agreement was formed. Accordingly, Count I fails to state a cognizable claim under § 1 based on bid-rigging.

(ii)

█ Nor has Zachair alleged facts sufficient to support its claim under Count II that the defendants conspired generally to restrain interstate commerce in violation of § 1 of the Sherman Act. "To prove a violation of the Act, a plaintiff must establish two ele-

---

3. Indeed, Zachair's alleged link to interstate commerce is based on the sand and gravel business, not on landowning in some abstract sense. *See* Compl. ¶¶ 35–37. Were "landowning" a plausible basis for satisfying the interstate commerce inquiry under the Sherman Act, there would be virtually no limit on the class of plaintiffs who could bring antitrust claims.

ments: (1) There must be at least two persons acting in concert, and (2) the restraint complained of must constitute an unreasonable restraint on interstate trade or commerce." *Estate Const. Co. v. Miller & Smith Holding Co. Inc.*, 14 F.3d 213, 220 (4th Cir. 1994). As to Count II, Zachair's complaint lacks the factual basis necessary to support an allegation of concerted action.

Zachair bases its general conspiracy claim upon allegations that all of the named defendants: (1) agreed to rig bids at the foreclosure sale; (2) filed meritless exceptions to the foreclosure sale; (3) filed a meritless complaint challenging the NationsBank deeds of trust; (4) refused to vacate the property after the foreclosure sale was ratified; (5) failed to prosecute their appeals from the foreclosure proceedings; (6) depleted the property's resources after the foreclosure sale; (7) attempted to block the transfer of SMSGC's mining permit to Silver Hill; (8) and attempted to prevent Zachair from obtaining a new special exception to conduct mining on the property. What is immediately apparent from these allegations is that, absent the inclusion of the bid-rigging allegation, these allegations involve only the Driggs defendants—John A. Driggs, Driggs Corporation, SMS & G, CS & G, WEALP, and Airpark (and Frost, before he was dismissed voluntarily by Zachair).

**4.** In the complaint, Zachair does not expressly allege that Driggs controls WEALP, but in its responsive brief it indicates that WEALP is, along with the other primary defendants, commonly controlled by Driggs.

In a desperate attempt to regroup, Zachair attempts to distance itself from the legal theories it espoused in its complaint. In its responsive brief, Zachair argues that until discovery reveals the "ownership and management structure" of the primary defendants, it is too early to conclude that the primary defendants are incapable of conspiring among themselves. This argument, while substantively valid, is procedurally deficient because it contradicts the allegations in Zachair's complaint that Driggs controls the primary defendants. As the defendants correctly point out, Zachair is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint. *See Henthorn v. Dept. of Navy*, 29 F.3d 682, 688 (D.C.Cir.1994); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert.*

According to Zachair, John Driggs commonly "controls the business affairs" of the Driggs defendants.[4] Under the "intracorporate immunity doctrine," corporate entities that have complete unity of interests, such as a parent company and its wholly-owned subsidiary or a corporation and its unincorporated divisions, act as a single firm and therefore cannot constitute a combination or conspiracy as required under § 1. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984); *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 703 (4th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992). Zachair's very allegations establish that the Driggs defendants have a unity of interests under the *Copperweld* standard and may avail themselves of the intracorporate immunity doctrine.

Thus, the only way Zachair might satisfy the concerted action requirement under § 1 is by including the bid-rigging allegation and its defendants, Jaffe and Shapiro, as part of the general conspiracy claim. Manifestly, however, this ploy does not advance Zachair's efforts to state a cognizable claim. The allegations contained in Count II, i.e., that the Driggs defendants filed petitions and refused to vacate the property, are immaterial for § 1 purposes. Jaffe and Shapiro clearly played no role in any of these non-bid-rigging allegations that form the basis of the general conspiracy claim.[5] Indeed, if Jaffe

*denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

**5.** In his responsive brief, Zachair attempts to contradict this fact by arguing that Jaffe and Shapiro's attendance at the foreclosure sale "served as the basis for" the other defendants' involvement in the WEALP bankruptcy proceedings, the foreclosure proceedings, and the mining permit proceedings. However, Jaffe and Shapiro's attendance at the foreclosure sale could not have been the predicate for the WEALP bankruptcy proceedings, because the foreclosure sale occurred after the WEALP bankruptcy proceedings. Moreover, Jaffe and Shapiro's attendance at the foreclosure sale had nothing to do with the other defendants' actions in opposing transfer of the mining permit. Indeed, it is not clear how Jaffe and Shapiro are related to this entire matter except that they attended the foreclosure sale. Zachair has not alleged that any of the defendants bid at the sale. If the defendants had bid at the sale and lost, then it would be inferable

and Shapiro were material parties to these allegations, then there would have been no need for Zachair to distinguish between the "primary" Driggs defendants and the "additional bid-rigging" defendants, a distinction clearly indicating that Jaffe's and Shapiro's roles are expressly limited to ostensible bid-rigging. Moreover, Zachair has attempted to press a separate bid-rigging claim in Count I, which fails for the reasons already discussed. Zachair cannot avoid the legal frailties of its claims by cobbling together wholly unrelated parties and allegations in hopes that something of the antitrust sort will stick. At its core, the complaint as a whole evidences a lack of concerted activity sufficient for § 1 purposes. *Estate Const. Co.*, 14 F.3d at 221–22. As in the *Estate Const. Co.* case, the gravamen of the wrongs alleged in the instant complaint involves merely "a single real estate foreclosure." *Id.*

■■■■■ Zachair makes a final attempt at bolstering its purported claim by contending that the defendants' numerous court filings constitute sham litigation, a *per se* violation of the Sherman Act. *See e.g., El Cajon Cinemas v. American Multi–Cinema*, 832 F.Supp. 1395, 1399 (S.D.Cal.1993). Sham litigation has a two-part definition. It is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993). Moreover, it conceals an attempt to interfere directly with the business relationships of a competitor by using the governmental process as an anti-competitive weapon. *Id.* (quoting *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961)); *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991). Proof of these two components

deprives a defendant of immunity (i.e., "*Noerr* immunity") from antitrust liability for seeking governmental redress. Nevertheless, the plaintiff still must prove a substantive antitrust violation. *See Professional Real Estate Investors*, 508 U.S. at 61, 113 S.Ct. at 1928–29. Thus, even presuming Zachair has sufficiently alleged sham litigation, the net of Zachair's allegations is that the defendants cannot assert *Noerr* immunity as a defense. Zachair must still support his underlying antitrust claim, and Zachair has failed to do so. Neither the prolixity of its complaint nor its use of magic words such as "objectively baseless" to characterize the facts alleged compensates for the deficiencies uncovered above. Accordingly, for all the reasons discussed, Count II also must fail as a matter of law. Zachair has not suggested how it might cure the defects discussed above, and so the dismissal of the federal antitrust claims shall be with prejudice.

### III

The defendants also contend that Zachair's counsel violated Maryland Rule of Professional Conduct[6] 4.2, and culpably aided and abetted Frost's violation of Rules 1.6(b) and 1.9, by engaging in *ex parte* communication without the defendants' counsel's presence or consent, and under circumstances made possible because plaintiff's counsel proceeded with abandon to commence discovery in direct contravention of this Court's Local Rules, which provide that discovery in a case of this sort is stayed, in the absence of agreement among counsel, until the Court issues a scheduling order. For this conduct, the defendants seek disqualification of Zachair's counsel and suppression of wrongfully obtained material.

■■■■ "Federal courts have inherent authority to discipline attorneys who appear before them for conduct deemed inconsistent with ethical standards imposed by the court."

---

that the defendants opposed transferring the mining permit because they failed to reacquire the property. Absent these facts, there is no rational basis to conclude that the additional bid-rigging defendants' presence at the foreclosure auction was a foundation for the Driggs defendants' opposition to transferring the mining permit.

**6.** The *Maryland Lawyers' Rules of Professional Conduct* are set forth as an Appendix to Md. Rule 16–812 (1997). The rules at issue in this case are set forth *infra* nn. 7, 12 and 13.

*MMR/Wallace Power & Indus. v. Thames Associates,* 764 F.Supp. 712, 717 (D.Conn. 1991); *see Tessier v. Plastic Surgery Specialists, Inc.,* 731 F.Supp. 724, 729 (E.D.Va.1990) ("The Court is charged with the duty and responsibility of supervising the conduct of attorneys who appear before it."); *see also Plant Genetic Systems, NV v. Ciba Seeds,* 933 F.Supp. 514, 517 (M.D.N.C.1996) ("A motion to disqualify an attorney is addressed to the discretion of the district court...."). Under Local Rule 704, I must "apply the Rules of Professional Conduct as they have been adopted by the Maryland Court of Appeals." *See Blumenthal Power Co. v. Browning–Ferris, Inc.,* 903 F.Supp. 901 (D.Md.1995).

 A motion to disqualify counsel is a "serious matter," *Plant Genetic Systems,* 933 F.Supp. at 517, which must be decided on a case-by-case basis. *See Buckley v. Airshield Corp.,* 908 F.Supp. 299, 304 (D.Md.1995). This is so because two significant interests are implicated by a disqualification motion: "the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community." *Tessier,* 731 F.Supp. at 729; *Buckley,* 908 F.Supp. at 304. Nevertheless, "the guiding principle in considering a motion to disqualify counsel is safeguarding the integrity of the court proceedings." *Plant Genetic Systems,* 933 F.Supp. at 517; *see Hull v. Celanese Corporation,* 513 F.2d 568, 572 (2d Cir.1975) (finding that a party's free choice of counsel must yield to "considerations of ethics which run to the very integrity of our judicial process."). Thus, this Court must not weigh the competing issues "with hair-splitting nicety but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing the appearance of impropriety, [this Court] is to resolve all doubts in favor of disqualification." *United States v. Clarkson,* 567 F.2d 270, 273 n. 3 (4th Cir. 1977) (internal quotation marks and citations omitted); *Rogers v. Pittston Co.,* 800 F.Supp. 350, 353 (W.D.Va.1992); *Buckley,* 908 F.Supp. at 304.

(i)

Recently, in *Camden v. State of Maryland,* 910 F.Supp. 1115 (D.Md.1996), Judge Messitte was faced with facts remarkably similar to the case at bar. There, the Special Assistant to the President of Bowie State University (BSU), Richard Redmond, was in charge of investigating a discrimination case filed by Dorothy Camden, a former BSU employee. As the "principal contact person" on the Camden case, Redmond was exposed to confidential communications among BSU's officers, including BSU's assessment of Camden's case and the merits of BSU's defenses. *Id.* at 1116–17. Indeed, it was Redmond who prepared and signed BSU's response to the complaint Camden filed with the Equal Employment Opportunity Commission.

Ironically, Redmond and BSU later found themselves in conflict with each other, which resulted in Redmond leaving BSU's employ "on less than amicable terms." *Id.* at 1117. Thereafter, Camden's attorneys filed a motion for leave to file an amended complaint and brandished a new weapon: an affidavit from Redmond revealing confidential information that was damaging to BSU's defense. BSU's counsel immediately requested that Camden's counsel refrain from conducting any further *ex parte* communications with Redmond unless subject to a court order, and counsel requested a copy of the notes Camden's counsel prepared during the *ex parte* communication. (This was not the first time BSU's counsel had made such a request. While BSU was still investigating Camden's claims, one of Camden's counsel attempted to have *ex parte* contact with Redmond, but upon BSU's counsel's request, Camden's counsel agreed not to attempt any further contact.) Camden's counsel refused all of BSU's counsel's requests, but agreed to send counsel copies of documents Redmond had tendered to Camden's counsel. Consequently, BSU filed a motion to strike Redmond's affidavit and disqualify counsel. Judge Messitte permitted a special deposition of Redmond, and determined that Redmond had disclosed confidential communications.

Thereafter, Judge Messitte held that, pursuant to Rule 4.2 [7],

> a lawyer representing a client in a matter may not, subject to few exceptions, have *ex parte* contact with the former employee of another party interested in the matter when the lawyer knows or should know that the former employee has been extensively exposed to confidential client information of the other interested party. As a rule, such *ex parte* contact may occur only with the consent of the other interested party's lawyer or approval of the court.

*Id.* at 1116.

In reaching the conclusion that counsel had committed a violation and that disqualification was appropriate, the *Camden* court meticulously examined the sharp conflict of opinion that has emerged among courts and commentators over the *rationale for*, in the first instance, as well as the appropriate *scope* of the prohibition against, *ex parte* contacts by counsel with current and former employees of an adverse party, in light of the text and purpose of Rule 4.2 and its predecessor. *Id.* at 1118–22. The Court concluded that the weighty interests undergirding the attorney-client privilege militated in favor of an analysis which accorded significance to the attorney-client privilege as an important factor in the interpretation and application of Rule 4.2. *Id.* at 1119–20 ("[P]rotection of information covered by the attorney-client privilege (as well as the work product privilege) has been traditionally cited as one of the prime objectives of the no-contact rule."), discussing *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), and *Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990).

Ultimately, the *Camden* court found that the "best approach" to the issue of whether *former* employees (and precisely *what class* of former employees) might be contacted notwithstanding the Rule was that fashioned by Preliminary Draft No. 10 of the Restatement of the Law Governing Lawyers. The Court reasoned as follows:

> But the best approach in the Court's view and the one it now adopts is that suggested by Preliminary Draft No. 10 of the Restatement of the Law Governing Lawyers. Restatement (Third) of the Law Governing Lawyers (Preliminary Draft No. 10, 1994). Thus Section 159 of the proposed Restatement would include in the definition of a "represented person" within the meaning of its no-contact rule (§ 158), "with respect to an organization represented by a lawyer, a person connected with the organization: (1) who supervises, directs or regularly consults with a lawyer representing the organization concerning the matter."

> This accords with and clarifies the holding of *Niesig.*

> But proposed § 162 of the Restatement goes beyond *Niesig* and would impose a no-contact rule with regard to "a person whom the lawyer knows to have been extensively exposed to relevant trade secrets, confidential client information, or similar confidential information of another party interested in the matter."

> The rule, applicable to former as well as current employees, focuses not upon the individual's status as employee, but looks instead to the extent of the confidences shared. Its rationale is obvious. Where the risk of breaching protected areas is great, prophylactic provision must be made for monitoring. This can be accomplished if either organizational counsel is present to object or if the court has set appropriate ground rules in advance. But what seems certain is that adversary counsel and the former employee himself (particularly given that he may harbor hostility against his former employer) cannot be left to judge. *Niesig's* determination to exclude former employees from the no-contact rule is thus rejected, but its concern for relatively free and easy access to former employees is not. As Comment [d] to Proposed Rule

---

**7.** Rule 4.2 provides that:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

162 points out: "Only some persons exposed to a principal's confidential information will have been exposed to the extent stated." Former employees whose exposure has been less than extensive would still be available for *ex parte* interviews.

The rule of the draft Restatement is not merely the product of the draftsman's imagination nor does it require an interpretation of Rule 4.2 that strains to find that a former employee is a represented "party." Ample case authority supports limitations on contact with former employees who have had extensive exposure to privileged information. *See, e.g., Rentclub, Inc. v. Transamerica Rental Fin. Corp.,* 811 F.Supp. 651 (M.D.Fla.1992), [*aff'd,* 43 F.3d 1439 (11th Cir.1995) (*per curiam*) ]; *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.,* 764 F.Supp. 712 (D.Conn. 1991); *Chancellor v. Boeing Co.,* 678 F.Supp. 250 (D.Kan.1988); *Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037 (W.D.Mo.1984); Hazard & Hodes, *supra,* at § 4.2:107 (Rule 4.2 violated where there is high risk former employee will disclose confidential information); *cf. Lang v. Superior Court,* 170 Ariz. 602, 826 P.2d 1228 (Ariz.App.1992).

\* \* \* \* \* \*

What the proposed Restatement does, however, is to extract the organizing principle from these various authorities. Only insofar as a former employee has been *extensively* exposed to confidential information and only insofar as an adversary attorney knows (or, it must be added, should reasonably know) of that fact, will *ex parte* contact be precluded. So long as privileged matters are respected, all other former employees remain fair game. This balancing of interests, in the Court's view, is both fair and reasonable.

*Id.* at 1121–22 (citations and footnotes omitted; emphases in original).

(ii)

◼ Much ado has been made by Zachair's counsel concerning *Camden's* legitimacy, given that the Maryland Court of Appeals has not ruled on the issue whether Maryland Rule of Professional Conduct 4.2 covers former employees, and given that the Maryland State Bar Association has issued an ethics opinion, Docket 86–13, concluding that counsel is not forbidden from speaking *ex parte* with former employees of a corporate adverse party. It is settled, however, that the opinions issued by the Ethics Committee of the Maryland State Bar Association are not binding on the Court of Appeals.[8] *Attorney Grievance Commission of Maryland v. Gregory,* 311 Md. 522, 531, 536 A.2d 646, 651 (1988). Thus, when faced with applying Maryland law to an issue of first impression, this Court, like others, and in keeping with the general rule, is at liberty to examine authority from other jurisdictions and adopt that which the Court finds most persuasive. *Cf. Reid v. Life Insurance Co. of North America, Inc.,* 718 F.2d 677, 679–80 (4th Cir.1983) (applying South Carolina law to an issue of first impression and finding that, in the absence of controlling South Carolina authority, the court should examine decisions from other jurisdictions); *Clinton Mills, Inc. v. Alexander & Alexander, Inc.,* 687 F.Supp. 226, 229 (D.S.C.1988) (interpreting a disciplinary rule as a matter of first impression under South Carolina law and examining authority from other jurisdictions); *Harris v. State,* 312 Md. 225, 242, 539 A.2d 637, 645 (1988) (examining caselaw from other jurisdictions to decide an issue of first impression under Maryland law).

◼ Moreover, whether or not *Camden* is palatable to Zachair's counsel is beside the point for present purposes. The fact is, *Camden* was decided on January 24, 1996, more than eight months prior to the day Zachair's counsel engaged in the *ex parte* contact with Frost. Zachair's counsel cannot assert ignorance of the law as an excuse for violating caselaw that unequivocally governs

**8.** As one commentator has aptly stated: "Lawyers refer to their profession as 'self-regulating,' but this term is misleading as well as wishful." Bruce A. Green, *Whose Rules of Professional Conduct Should Govern Lawyers in Federal Court and How Should the Rules Be Created?,* 64 Geo. Wash. L.Rev. 460, 461 (1996) (footnotes omitted).

his conduct as a practicing attorney in a case pending before this Court. Even if Zachair's counsel was unaware of *Camden,* he certainly was aware of this Court's express statement to opposing counsel that Frost's deposition was premature under Local Rule 104.[9] Therefore, I emphatically reject Zachair's counsel's assertion that *Camden* is an aberration, and I shall apply its holding to the facts presently before the Court.

### (iii)

■■ Under *Camden,* there is no doubt that Zachair's counsel violated Rule 4.2 when he conducted a day-long, transcribed "interview" with Frost; an *in camera* review of the "interview" transcript has revealed that Frost disclosed information undoubtedly confidential and almost certainly violative of the Driggs defendants' attorney-client privilege.[10] Zachair's counsel was well aware that Frost had served, *inter alia,* as general counsel to the Driggs defendants. Moreover, Zachair had initially named Frost as a defendant, indicating that Frost was allegedly involved in the actions for which Zachair seeks recourse, and thus necessarily privy to information concerning those actions. It is important to recall, for example, that Frost entered his appearance on behalf of Driggs Corporation in the foreclosure action, and he attended the foreclosure sale with a certified check drawn on a Driggs Corporation bank account. These facts compel the conclusion that Zachair's counsel knew, or should have known, that Frost had been extensively exposed to confidential information concerning the Driggs defendants.

Indeed, the facts of this case present a more compelling need to interpret Rule 4.2 consistent with the *Camden* principles than the facts of *Camden* itself. In *Camden,* the former employee involved in *ex parte* contact was a special assistant to the president of Bowie State University who coordinated the University's affirmative action programs. 910 F.Supp. at 1116. Here, I am confronted with a former general counsel—himself an attorney who is, or should be, well aware of his ethical obligations to his former client, however acrimonious their parting—who disclosed confidential information to his former client's adversary concerning this litigation as well as unrelated matters. Frost's former position as general counsel[11] greatly intensi-

9. Zachair's counsel's characterization of the transcribed and extensive discussion with Frost as an "informal interview" instead of a deposition is itself disingenuous and ethically attenuated.

10. A mere sampling of Frost's comments seems clearly to disclose that he divulged the content of confidential communications that would be protected by the attorney-client privilege. For example, Frost stated that part of the reason he qualified to bid at the foreclosure sale was "to [deleted]," thereby disclosing strategical information his client had shared with him regarding this case. Frost Transc. pp. 120–21. Frost explained that John Driggs could have gone to court and petitioned "the court to stop it before the foreclosure but under Maryland rules you have to put a bond up for that and [John Driggs] [deleted]." *Id.* at 121. Frost continued that while he was not sure whether John Driggs intended to post a bond in order to appeal, Frost was certain that John Driggs "never intended to [deleted]." *Id.*

Ironically, Zachair's counsel vigorously objected to the request by defendants' counsel that they be provided with a copy of the Frost transcript, invoking the work product privilege. Thus, my own limited deduction, *inter alia,* from the context of the questions and the form of the responses to those questions, as to the extent to which the attorney-client privilege attached to the many disclosures made by Frost, is unaided by the knowing insight that could be provided by defendants and their counsel.

11. While Frost served the Driggs defendants in other official capacities, such as vice-president of the various Driggs entities, an *in camera* review of the transcript from Frost's communication with Zachair's counsel reveals that much, if not most, of Frost's exposure to confidential information and the related advice sought from Frost resulted from Frost's capacity as an attorney. Moreover, the transcript reflects that even when Frost was acting in his "business" capacity, the Driggs defendants sought, and Frost rendered, advice that was augmented by his legal skills and expertise. Thus, while I recognize the inapplicability of the attorney-client privilege where an attorney is serving in a non-legal capacity, *see North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.,* 110 F.R.D. 511, 514 (M.D.N.C.1986), I am also mindful that an attorney, acting in a non-legal capacity, frequently performs duties that invoke legal expertise and judgment grounded in legal training. In the latter instance, where the attorney is not performing a pure, ordinary business function, the attorney-client privilege fully applies. *See In re Allen,* 106 F.3d 582, 602–603 (4th Cir.1997).

fies the apprehension rightly expressed in *Camden* that confidential information will be disclosed in the *ex parte* setting, because as the transcript reveals, the Driggs defendants relied heavily on the protection provided by the attorney-client privilege to communicate freely about matters with Frost. *See Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 912–13, 63 L.Ed.2d 186 (1980) (explaining that the attorney-client privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."). The concern shared by Rule 4.2 and the attorney-client privilege is that an individual (or entity) who reveals confidences to another individual occupying a position of high responsibility, most often a manager, but here an attorney consulted as such, should enjoy some assurance (at least in the context of on-going litigation) that those confidences cannot be freely divulged to third parties unless certain prophylactic measures are in place. Here, due to the *ex parte* communication Zachair's counsel had with Frost, the opportunity for which was improperly set in motion by a blatant disregard of this Court's Local Rules, the defendants were wholly deprived of an opportunity to invoke any prophylactic measures to prevent Frost from disclosing confidential information (as he had threatened to do) that is directly relevant and material to this case. As *Camden* observed: "[W]hat seems certain is that adversary counsel and the former employee himself (particularly given that he may harbor hostility against his former employer) cannot be left to judge" the permissibility of any series of questions. 910 F.Supp. at 1121–22. On this record, therefore, I am constrained to conclude that Zachair's counsel violated Rule 4.2 by engaging in *ex parte* contact with a former employee of the Driggs defendants whom Zachair's counsel well knew had been extensively exposed to confidential information, much of it almost certainly draped in the protective cloak of the attorney-client privilege. The appropriate remedy for this violation of the Rules of Professional Responsibility is to disqualify counsel from any further representation in the matters covered by this lawsuit.

(iv)

The defendants contend, and I am driven by the evidence to conclude, that Rules 1.6(b) [12] and 1.9 [13] provide independent grounds for disqualifying Zachair's counsel. These rules prevent an attorney from disclosing information relating to the attorney's representation of a current or former client, except in certain circumstances. Here, it matters not whether the information the attorney disclosed is confidential; the inquiry is whether, generally speaking, the attorney disclosed information relating to his or her representation of the client. In the case *sub judice*, the answer to this question is an unequivocal "yes."

However, I must inquire further whether Frost's disclosure fits into one of the circumstances allowed under Rules 1.6 and 1.9. Zachair's counsel contends that the "self-defense" exception embraced by Rule 1.6(b)(3) applies to Frost's disclosures. More specifically, Zachair's counsel argues that Frost disclosed information pertaining to his former client solely to be dismissed as a defendant and thus clear himself of any potential liability for the alleged violations.

---

**12.** Rule 1.6 provides, in pertinent part, as follows:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

. . . . .

(3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal charge, civil claim, or disciplinary complaint against the lawyer based upon conduct in which the client was involved or to respond to allegations in any proceedings concerning the lawyer's representation of the client.

**13.** Rule 1.9 provides, in pertinent part, that "[a] lawyer who has formerly represented a client in a matter shall not thereafter: . . . (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

There are several problems with this argument. First, the two hundred and forty-pages of transcription reveal that Frost disclosed information above and beyond what was needed to absolve himself of liability. As the Comment to Rule 1.6 provides, "disclosure should be no greater than the lawyer reasonably believes is necessary to vindicate innocence, the disclosure should be made in a manner which limits access to the tribunal or other persons having a need to know it, and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable." *See also First Federal Savings & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.*, 110 F.R.D. 557, 566 (S.D.N.Y.1986) (recognizing the self-defense exception but applying procedural and substantive limits on its applicability). Frost, aided and abetted by Zachair's counsel (who had offered to "indemnify" Frost), disregarded each of the protective measures articulated in the Comment. Second, and perhaps unsurprisingly, the transcript does not reflect a measured and restrained effort by Zachair's counsel to elicit only that information from Frost which would exculpate him. Rather, the transcript illuminates the fishing expedition in which Zachair's counsel engaged, and shows that the meeting was animated by the campaign on which Frost embarked to malign and "ruin" John A. Driggs and the entities associated with Driggs. Add to this the fact that Frost was dismissed as a defendant even before he offered any exculpatory testimony, and the sum total is that Frost's disclosures, encouraged, if not purchased [14], by Zachair's counsel, do not fall within the cautiously and narrowly-defined self-defense exception under Rule 1.6(b)(3).

(v)

For more than nine years, Frost occupied various positions of paramount importance to the Driggs defendants, most important of all as general counsel, and had intimate knowledge of their confidential communications, including, of course, information critical to the present case. In one day, Frost intentionally divulged the most sacred of his former clients' confidences to adverse parties involved in on-going litigation. The substance of this communication, "whether or not useable in evidence ... entered into and remain[s] in [Zachair's counsel's] knowledge, with unknown effect upon [his] negotiating position or possible trial strategy." *Camden*, 910 F.Supp. at 1123. This wrongly obtained knowledge "can never be erased from [counsel's] mind," and as a consequence the information must be excluded and counsel must be disqualified.

IV

For all the reasons discussed herein, I shall dismiss the federal claims asserted in Zachair's complaint with prejudice, and I shall grant the defendants' motion to disqualify Zachair's counsel and suppress wrongfully obtained information. A separate order follows.

ORDER

In accordance with the foregoing Opinion, it is this 3rd day of June, 1997, by the United States District Court for the District of Maryland, ORDERED

(1) That the motions of defendants John A. Driggs, The Driggs Corporation, Southern Maryland Sand and Gravel Corporation, Washington Executive Airpark Limited Partnership, Washington Executive Airpark, Inc., and Cecil Sand and Gravel, Bruce Jaffe and Charles Shapiro to dismiss the plaintiff's complaint BE, and they hereby ARE, GRANTED IN PART AND DENIED IN PART, AND ALL FEDERAL CLAIMS ASSERTED IN THE COMPLAINT ARE DISMISSED WITH PREJUDICE FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED, and the state law claims are DISMISSED WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION; and it is further ORDERED

---

14. *See supra* pp. 748–749. Frost asserted that he was offered "indemnity" in return for his cooperation. *Cf Rentclub, Inc. v. Transamerica Rental Fin. Corp.*, 811 F.Supp. 651 (M.D.Fla.1992), *aff'd*, 43 F.3d 1439 (11th Cir.1995) (*per curiam*) (affirming disqualification where counsel hired adverse party's former employee as a "trial consultant" who testified as a witness).

(2) That the motion of defendants John A. Driggs, The Driggs Corporation, Southern Maryland Sand and Gravel Corporation, Washington Executive Airpark Limited Partnership, Washington Executive Airpark, Inc., and Cecil Sand and Gravel, Inc. to disqualify plaintiff's counsel and suppress wrongfully obtained material BE, and it hereby IS, GRANTED; and it is further ORDERED

(3) That Roger C. Simmons and the law firm of Gordon and Simmons are hereby (i) prohibited from representing plaintiff or any party affiliated with plaintiff in this case or any case in any federal court involving the same or substantially the same matters, provided that Mr. Simmons is permitted by this Order to prosecute an appeal of this Order to the United States Court of Appeals for the Fourth Circuit and thereafter, any and all subsequent efforts at appellate review; (ii) required to destroy all materials in their possession or in the possession of plaintiff that were supplied by or that contain information supplied by Jeffrey M. Frost, Esq., within ten days of the entry of this Order and to file an affidavit of compliance with this Court within five days thereafter, provided that this requirement set forth in this ¶ (3)(ii) is suspended during any period of appellate review of this Order; and (iii) prohibited from conveying to any successor counsel any information obtained from Mr. Frost or as a result of information obtained from Mr. Frost; and it is further ORDERED

(4) That the Clerk of the Court shall CLOSE this case and MAIL copies of this Order and the foregoing Opinion to the attorneys of record.