UNITED STATES of America,

v.

HOUSING AUTHORITY OF THE TOWN
OF MILFORD, and City of Milford.

N.A.A.C.P., et al.,

v.

HOUSING AUTHORITY OF THE
TOWN OF MILFORD, et al.

Civil Nos. 3:96CV01118 AHN,
3:97CV785 AHN.

United States District Court,
D. Connecticut.

Dec. 19, 1997.

John William Dietz, Stephen P. Fogerty,
Robert Avery Rhodes, Halloran & Sage,
Westport, CT, for Frederick Lisman.

James G. Williams, Robert J. Flanagan Jr.,
Cella, McKeon & Williams, North Haven,
CT, for Town of Milford, George R. Ronkowitz, and Keith Rubenstein

J. Daniel Sagarin, David A. Slossberg,
Hurwitz & Sagarin, Milford, CT, for Town of
Milford and Frederick Lisman.

Philip D. Tegeler, Connecticut Civil Liberties Union Foundation, Hartford, CT, Shelley
A. White, New Haven Legal Assistance, New
Haven, CT, for Anthony Carter, NAACP,
and Beverly McDonald.

Althea E. Seaborn, U.S. Attorney's Office,
Bridgeport, CT, Je Yon Jung, Seth Rosenthal, Kenneth H. Zimmerman, U.S. Dept. of
Justice, Washington, DC, for U.S.

## RULING ON MOTION FOR APPROVAL OF EX–PARTE CONTACT

FITZSIMMONS, United States Magistrate Judge.

The United States brings a four count civil rights action against defendants [1] for violation of (1) the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, (2) Title VII, 42 U.S.C. § 2000d, (3) the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.*, (4) the Civil Rights Act, 42 U.S.C. § 1983, and (5) the Fourteenth Amendment to the United States Constitution. Jurisdiction is predicated on the existence of a federal question, pursuant to 28 U.S.C. § 1331. Pending is plaintiff's Motion for Approval of Plaintiff's Intended Contact with Former Official of Defendant Housing Authority. [Doc. # 53]. Oral argument was held on September 5 1997. For the reasons that follow, plaintiff's motion is **GRANTED**.[2]

### STANDARD OF LAW

 In a motion for court approval to allow the *ex parte* interview of a former employee of a party to litigation, the burden of establishing the essential elements of the attorney-client privilege is on the party claiming the protection of the privilege. *von Bulow By Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir.1987) (quoting *In re Grand Jury Subpoena Dated January 4, 1984*, 750 F.2d 223, 224 (2d Cir.1984)). The burden is not discharged by mere conclusory or *ipse dixit* assertions. *In re Grand Jury Subpoena Dated January 4, 1984*, 750 F.2d 223, 225 (2d Cir.1984) (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir.1965)). The definition of attorney-client privilege is "(1) [w]here legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from himself or by the legal advisor, (8) except the protection be waived." *United States v. Stern*, 511 F.2d 1364, 1367–

68 (2d Cir.1975) (Wigmore, Evidence § 2292 (McNaughton Rev.1961)).

### FACTUAL BACKGROUND

Defendant Housing Authority of the town of Milford is a municipal corporation which receives federal funds for the development and operation of housing affordable to low income persons. The Authority has an executive director. [Doc. # 54 at 2–3].

In March 1991, the Authority received $3.5 million from the United States Department of Housing and Urban Development ("HUD"). In 1995, the Authority approved a plan to use the money to buy existing one and two family homes throughout Milford which were to be made available to low income persons as Authority housing. This is also known as scattered site housing. [Doc. # 54 at 3].

At an August 28, 1995, meeting, residents of Milford voiced opposition to the housing program. This vocal opposition continued up to September 11, 1995. The public opposition was motivated at least in part by the belief that the new scattered site housing would be occupied by people from New Haven and Bridgeport. [Doc. # 54 at 3]. On September 11, 1995, the city's Board of Aldermen passed a resolution "demanding" that the Housing Authority "immediately rescind all activities" related to the purchase of the first houses for the scattered site program and, in addition, "immediately take any and all steps necessary to officially and permanently remove Milford from the federal Scattered Site Housing Program." [Doc. # 54 at 4]. The following day, on September 12, the Housing Authority's Board of Commissioners enacted a resolution to "cease the development of the [scattered site] program." [Doc. # 54 at 4].

By letter dated September 12, the New Haven Legal Assistance Association, Inc. warned that the vote to abandon the scattered site program would "potentially subject the Housing Authority to liability under the

---

**1.** Defendants are the City of Milford, the Housing Authority of the Town of Milford, Commissioner and Former Chairman of the Housing Authority of the Town of Milford George R. Ronkowitz, Chairman of the Housing Authority of the Town

of Milford Keith Rubenstein, and Mayor of the City of Milford Frederick Lisman.

**2.** Judge Nevas referred this motion to a magistrate judge on July 24, 1997. [Doc. # 58].

Federal Fair Housing Act, 42 U.S.C. § 3604 *et. seq.*" [Doc. # 63, Exhibit A].

After an investigation, the United States Justice Department in April 1997 filed simultaneous lawsuits against the City of Milford and its Housing Authority.[3]

Before the Court is the Government's motion to approve its contact with Fred Wallace, the former Executive Director of the Housing Authority. Fred Wallace was the executive director from 1992 to November 1995. He left the job approximately two months after the scattered site housing plan was canceled. [Doc. # 54 at 4–5].

In August 1996, Robert J. Flanagan, counsel for the Housing Authority, met with Wallace. [Doc. # 63 C].

On June 12, 1997, the Government informed defendants by letter that it intended to interview Wallace *ex parte.* [Doc. # 63 B]. By letter dated June 16, 1997, defendants objected, asserting attorney-client privilege. [Doc. # 63 B].

After the parties failed to agree on a solution, they agreed to bring the question to this court for decision.

*DISCUSSION*

Defendants claim that communications between them and Wallace are protected under attorney-client privilege and the attorney work product doctrine. Second, they argue that concern for the protection of attorney-client privilege trumps any interest in informal access to Wallace's testimony. Last, defendants contend that prior misconduct by the Government constitutes grounds for prohibiting *ex parte* communication with Wallace.

The Government argues that this motion should be granted because a Department of Justice regulation, 28 C.F.R. 77.10(b) sanctions *ex parte* contact with former employees of an opposing party; because the Connecticut Rules of Professional Responsibility 4.2 authorizes *ex parte* contact with former employees; and because there is no basis to assert ex parte contact with Wallace is improper. In asking the court's approval, the government emphasizes the importance of *ex parte* interviewing as a fundamental part of investigating cases.

As a general rule, attorney-client privilege will not preclude contact with former employees of an opposing party to litigation. *Dubois v. Gradco Systems,* 136 F.R.D. 341 (D.Conn.1991). In certain circumstances, a court may extend a party's privilege to cover the party's former employees. *Dubois,* 136 F.R.D. at 346. However, before the attorney-client privilege can be used to prevent such *ex parte* contact, the party asserting the privilege must meet its burden of establishing that the privilege exists. *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 144 (2d Cir.1987), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987) (quoting *In re Grand Jury Subpoena Dated January 4, 1984,* 750 F.2d 223, 224 (2d Cir. 1984)). An inquiry into whether a party asserting a privilege has met its burden-by-case basis. In addition, mere conclusory assertions that privilege exists do not satisfy the burden. *In re Grand Jury Subpoena,* 750 F.2d at 224–25.

Defendants' contention that Wallace has privileged information specific to this litigation has two bases. First, defendants claim that because the litigation was anticipated before Wallace left the Authority, Wallace is covered by the Authority's attorney client-privilege. Second, defendants urge that, even if this litigation were not anticipated, the August 1996 meeting between Wallace and attorney Flanagan converted him into a trial consultant.

## 1. ASSERTION OF PRIVILEGE DURING EMPLOYMENT

Defendants support their contention that the present litigation was anticipated before Wallace left the Authority by pointing to two letters. The first is a September 12, 1995, letter to the Authority in which the New Haven Legal Assistance Association, Inc stated, "[a] vote tonight to abandon the program would not only be acquiescence to ignorance and fear, but would potentially subject the Housing Authority to liability under the federal Fair Housing Act, 42

---

**3.** Doc. # 54 at 5–6

U.S.C. § 3604 *et. seq..*" [Doc. # 63 A]. Defendant Authority states that the letter made it "very plain that litigation would be forthcoming" if the scattered site housing were canceled. [Doc. # 62 at 6]. While this letter implies that litigation could result from cancellations, it was not a certainty or even likely at this point. The second letter the defendants point to is a September 25, 1995 letter in which the Connecticut Civil Liberties Union asked the Department of Justice to investigate the Authority's cancellation of the scattered site program. Again, at such an initial stage, such a letter could not reasonably have caused the Authority to anticipate litigation. Defendants also rely on the affidavit of Counsel for the Housing Authority, Chris Cody, to show that litigation was anticipated and Wallace had intimate knowledge of this. The affidavit states "I delivered to Mr. Wallace ... various legal advice and opinions concerning various issues involved in the scattered site program including potential litigation by various parties concerning the Housing Authority's actions concerning the scattered site program; ... In my role as general counsel for the Housing Authority and in an effort to aid in the defense of both the private plaintiffs action and the then anticipated action by the United States, I spoke with Fred Wallace on November 13, 1996." [Doc. # 63 D]. However these statements lack any specifics from which this court can draw a conclusion that Wallace had privileged knowledge arising from the expectation of litigation. The discussion referred to by defendants could have been addressed to underlying facts and not privileged material. *Upjohn v. United States,* 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Defendants contend that the Authority had been put on notice that it was going to be sued. The evidence falls short of that.

**4.** Connecticut Rule of Professional Responsibility 4.2—"In representing a client, a lawyer shall not communicate about the subject matter of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so ."

**5.** Comments to Connecticut Rule of Professional Responsibility 4.2—"In the case of an organization, the Rule prohibits communications by a

## 2. ASSERTION OF PRIVILEGE SUBSEQUENT TO EMPLOYMENT

Defendants contend that the communications they had with Wallace in August 1996 are privileged and so are protected by attorney-client privilege. The Government argues that Rule 4.2 of the Connecticut Rules of Profession Responsibility allows *ex parte* contact with Wallace as a former employee.[4] The defendants do not dispute the general application of the rule which allows *ex parte* contact with former employees, but contend the comments to the rule provide an exception under which Wallace falls.[5]

In *Dubois v. Gradco,* 136 F.R.D. 341 (D.Conn.1991), Judge Cabranes found that the former employees of an adverse corporate party could not themselves be considered adverse parties, within the meaning of Rule 4.2. (See also ABA Formal Opinion 95–396 at 28 n. 47). The Court noted, however, that there is an exception to this general rule, citing with approval G. Hazzard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 436–436.1 (1988 Supp.) (emphasis in original; citation omitted)

> [S]ome former employees continue to personify the organization even after they have terminated their employment relationship. An example would be a managerial level employee involved in the underlying transaction, who is also conferring with the organization's lawyer in marshaling the evidence on its behalf. But the rationale is a different one. This kind of former employee is undoubtedly privy to privileged information, including work product, and an opposing lawyer is not entitled to reap a harvest of such information without a valid waiver by the organization, or according to narrow exceptions to the discovery ...

lawyer for one party concerning the matter in representation with persons [1] having managerial responsibility on behalf of the organization, and [2] with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability, or [3] whose statement may constitute an admission on the part of the organization."

which permitted *ex parte* interviews of former employees unless they remained members of the "control group" (such as nonemployee directors).

*Dubois*, 136 F.R.D. at 346. This exception covers former employees who become trial consultants. *Id.* at 346. Both sides recognize this exception [Doc. # 54 at 13, Doc. # 62 at 13], but the parties disagree on whether Wallace is a trial consultant.

Defendants cite *MMR/Wallace Power & Industrial, Inc. v. Thames Associates*, 764 F.Supp. 712 (D.Conn.1991), in support of their contention that Wallace is a trial consultant and so falls under the exception. In *MMR/Wallace*, a former employee of a subcontractor assisted its former employer in preparing to sue a contractor. The former employee was responsible for setting up a document control system to manage the numerous document needed for the litigation. He was also responsible for reviewing, indexing, and digesting all of the various discovery materials. He additionally visited various locations where documents were stored and decided, with the plaintiffs, which documents should be copied. His duties included the preparation of a number of reports and analysis at the attorney's requests and on his own initiative on issues involved in the litigation. He also attended and participated in a number of confidential meetings with the plaintiff's counsel to discuss litigation tactics and strategies. He answered interrogatories. Additionally, he consulted with plaintiff's counsel regarding which persons were going to be deposed and what topics should be addressed. He was also an on-site observer. Lastly, he was in weekly contact with plaintiff's attorneys. *MMR/Wallace Power and Industrial*, 764 F.Supp. at 714–15. The former employee eventually contacted defendants and was interviewed *ex parte* about his knowledge of the case. The Court disqualified the defendant's attorneys. It reasoned that because of the privileged information the former employee possessed about the litigation, his *ex parte* contact with defendant's counsel was inappropriate. Since the interview had already occurred, the court disqualified the attorneys in order to control any taint in the trial.

In *MMR*, the court rightly characterized the former employee as a trial consultant. The distinct policy behind the exception in *Dubois* was plainly present in *MMR*. A "former employee" was "privy to privileged information, including work product" and therefore opposing counsel was not entitled to "reap a harvest of such information" *ex parte*. *Dubois*, 136 F.R.D. at 346. Here, however, there is insufficient evidence of the type of specific knowledge present in *MMR*, which would transform Wallace into a trial consultant. Wallace is not represented by defendants' counsel in this action; defendants have presented no evidence that Wallace has participated in the formulation or discussion of litigation tactics or strategy for this lawsuit. See *MMR/Wallace*, 764 F.Supp. at 714–15. When pressed at oral argument about what the nature of the privileged materials were, defendants declined to specify, claiming revealing such information might harm their case.

The defendants also rely on *Camden v. State of Maryland*, 910 F.Supp. 1115 (D.Md. 1996). However, that case, like *MMR* is distinguishable because the former employee clearly participated in trial preparation. Here, there is no evidence that Wallace was acting as a consultant to defendants' counsel in this pending litigation.

In support of defendants' contention that Wallace is a trial consultant, they provided an affidavit by Attorney Flanagan, noting that a meeting occurred in August 1996 after Wallace left his position with the Housing Authority in November 1995. The discussion purportedly involved "marshaling evidence to aid in the defense" of the present and potential future actions. [Doc. # 63 C]. Apart from this, defendants proffered no other facts from which this Court could determine if defendants met the burden of proving the existence of a privilege. No affidavit describes what occurred at the meeting or its purpose. At oral argument, defendants declined to give more than a vague indication about what the post-employment communication was.

Even if defendants are using Wallace as a trial consultant, they still have the burden of proving the attorney-client privilege exists

before it can be used to prohibit *ex parte* contact.

### 3. EX PARTE INTERVIEW

The Government argues that 28 C.F.R. § 77.10(b) permits *ex parte* contact with Wallace.[6] Defendants do not dispute that the regulation allows *ex parte* contact with former employees such as Wallace in other circumstances. However, defendants argue that since Wallace was utilized as a trial consultant, he falls under an exception to the rule.

It is beyond dispute that privileged information gained by Wallace as the Executive Director at the Authority should not be revealed if an *ex parte* interview occurs. Indeed, the Government concedes that attorney-client communications or work product during Wallace's employment at the Authority are privileged and may not be the subject of an *ex parte* interview. The disagreement is over whether the interview should be permitted at all. The Government answers the defendants' concern that an *ex parte* interview will reveal privileged information by citing a number of cases that have found an assurance by the *ex parte* interviewer not to delve into privileged material is sufficient to protect privileged information of a former employee.[7] *Jenkins v. Wal–Mart,* 956 F.Supp. 695, 697 (W.D.La.1997); *Brown v. St. Joseph County,* 148 F.R.D. 246, 255 (N.D.Ind.1993); *Shearson Lehman Brothers, Inc. v. Wasatch Bank,* 139 F.R.D. 412, 418 (D.Utah 1991); *Aiken v. Business Industry Health Group, Inc.,* 885 F.Supp. 1474, 1480 (D.Kansas 1995).

In particular, the Government cites *Concerned Parents v. Housing Authority of St. Petersburg,* 934 F.Supp. 406 (M.D.Fl.1996). There, a citizens group brought action against a public housing authority. Plaintiffs sought to interview the former executive director of the housing authority. The court allowed the *ex parte* interview, noting that matters protected by the attorney-client privilege were not to be discussed. *Concerned Parents* 934 F.Supp. at 409. Although the case seems factually similar, it is distinguishable in one key respect. The former director in *Concerned Parents* had the ability to identify what privileged information was. *Id.* at 409. Here, defendants argue that Wallace may not be able to distinguish what information is privileged. To a layperson, it is not always apparent what is privileged and what is not, especially when the element of a narrower government privilege is added into the mix. See *Frey v. H.H.S.,* 106 F.R.D. 32 (E.D.N.Y.1985) discussed below. Of note here, in a June 16, 1997 letter, the Government assured defendants that in an *ex parte* interview with Wallace they would not "inquire into any communications Mr. Wallace may have had with MHA counsel during the time he was employed by the MHA." [Doc. # 54, Unmarked Exhibit]. The Government repeated this assurance at oral argument.

The Government contends that the danger of privileged information inadvertently slipping out in an *ex parte* interview is greatly outweighed by the need for each party to obtain and refine evidence in support of its case without unnecessary impediments. The latter need, the Government contends, is a "basic predicate of our system of justice". [Doc. # 54 at 6]. The defendants argue that, if the interview takes place, this court should require that it occur pursuant to a properly noticed deposition at which all counsel may appear and cross examine. [Doc. # 55 at 18]. Defendants alternatively suggest that a transcribed record be made if an *ex parte* interview is allowed. [Doc. # 63 at 9 fn. 3].

In *I.B.M. v. Edelstein,* 526 F.2d 37 (2d Cir.1975), our Court of Appeals emphasized the importance of an opportunity to privately interview adverse witnesses. There, the district court ordered that certain interviews of adverse witnesses be recorded by a stenogra-

---

6. "A communication with a former employee of an organization that is represented by counsel shall be considered to be a communication with the organization for purposes of this part."

7. See also Connecticut Rule of Professional Responsibility 4.3—"In dealing on behalf of a client who is represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested, when the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter. The lawyer shall make reasonable efforts to correct the misunderstanding."

pher. Finding this inappropriate, the Court of Appeals noted that the restrictions

"[n]ot only impair the constitutional right to effective assistance of counsel but are contrary to time honored and decision honored principles, namely that counsel for all parties have a right to interview an adverse parties witnesses (the witness willing) in private, without the presence or consent of opposing counsel and without a transcript being made."

*I.B.M.*, 526 F.2d. at 42.

The Government also points to the additional responsibility a government entity has in promoting the public interest, which outweighs the narrower interest a governmental entity has in winning a lawsuit. *Frey v. H.H.S.*, 106 F.R.D. 32, 37 (E.D.N.Y.1985). Defendants argue that concern for the protection of the attorney-client privilege trumps any interest in informal access to Wallace's testimony. If no government entity were involved here, the defendants' point would be stronger. However where the case housing discrimination based on race by a public entity, the public interest comes into play.

Provided that the Government counsel makes it clear at the outset of the *ex-parte* interview that privileged communications are not to be divulged, and given that defendants are free to educate Wallace on the details of which prior communications are privileged, precluding an *ex parte* interview is not necessary to protect the confidences which may have been shared with the witness previously.

*CONCLUSION*

For the reasons stated, the Government's Motion for Approval of Plaintiff's Intended Contact with Former Official of Defendant Housing Authority [**Doc. # 53**] is **GRANTED.**