[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUN OF DECISION ON ALLEGATIONS OF MISCONDUCT
The underlying litigation arose from the extensive renovation of Amity Regional Senior High School located in Woodbridge, Connecticut. The renovation project began in 1992 and was substantially completed in 1995. The school property is owned by the Amity Regional School District No. 5 (Amity). The general contractor on the property was Atlas Construction Company (Atlas). In 1997, Atlas filed a ten count complaint against Amity, seeking damages in excess of $5 million. In 1999, Amity filed a separate lawsuit against Atlas[1] and a number of other parties who worked on the project, alleging breach of contract and negligence relating to the high school renovation project. In addition to these two matters over which this court currently presides, five other cases exist CT Page 2288 in which individuals allege that they have become ill as a result of defects in the Amity school building.[2]
During an October 30, 2000 hearing before this court, counsel for Atlas and the Lukmire Partnership, Inc. (Lukmire) alleged that counsel for Amity had attempted to suppress evidence and then by intimidation had sought to alter the report of third parties who, while providing services to Amity, expressed findings and opinions inimical to Amity's litigation position. In response to these allegations, the court in an order dated November 3, 2000 scheduled a hearing on the allegations of misconduct. The hearing was rescheduled to accommodate counsel, and finally went forward on December 12 — 13, 2000. In the notice of the hearing, the court specifically directed the parties to focus on Rule of Professional Conduct § 3.4, entitled "Fairness to Opposing Party and Counsel," and its subsections (1)(2) and (6).[3]
The alleged misconduct involves a discovery issue. In the Amity v.Atlas litigation, Atlas served interrogatories on Amity dated September 30, 1999, that include the following:
 72. Identify all reports, analyses and tests performed that relate in any way to the exterior wall system, fungus, or mold at School.
Defendants' exhibit 12.[4] Attorney Carole Briggs, as counsel for Amity, signed and served responses to these interrogatories, without objection to interrogatory number 72.
In August of 2000, Amity was involved in a repair and maintenance project on the Amity Regional Senior High School, the renovation of which is the subject of this litigation. The repairs and maintenance on the school were being managed by Service Master which, for over ten years, had served as the property manager for Amity with respect to its school buildings. In July of 2000, Gerry Keane was serving as the on-site manager for Service Master at the Amity Regional Senior High School. The service and maintenance projects were awarded pursuant to various contracts which were put out to bid. The miscellaneous general carpentry contract received no formal bids. Paul DiSpazio, president of DiSpazio Corporation, expressed to Keane that he was interested in the carpentry contract. The DiSpazio Corporation was notified by letter dated August 14, 2000 (defendants' exhibit 1), from Amity's Director of Financial Services, Vincent Grigano, that it had been awarded the miscellaneous minor projects contract pursuant to its proposal.[5] One of the projects for which DiSpazio was responsible under this contract was the replacement of sagging ceiling tiles in the school's suspended ceiling CT Page 2289 system.
Attorney Briggs has for twelve years "had the responsibility of counseling Amity not only about legal issues associated with pending lawsuits, but also about legal issues relating to a wide range of facilities management and construction topics concerning both Amity Senior High School ("High School") and two junior high schools under Amity's jurisdiction." (Court Exhibit 3, ¶ 4.) In other words, Attorney Briggs has been intimately involved in Amity's miscellaneous repair and maintenance projects, the procurement of outside contractors, as well as having legal oversight of several ongoing major building projects at the high school and junior high schools. (Court Exhibit 3, ¶ 5.)
Attorney Briggs and her consulting paralegal, who worked with her on an ongoing basis in the spring and summer of 2000, assisted Amity with the drafting, solicitations and review of proposals, and proposed requests from outside contractors to provide various services (approximately 22 different requests for proposals). On August 16, 2000, DiSpazio requested Keane's authorization to obtain an engineering study of the suspended ceiling system to determine why tiles were falling from the ceiling. Attorney Briggs was present at that meeting and was aware that DiSpazio would hire an engineer to assess the problem with the ceiling tiles. Attorney Briggs disputes her presence and knowledge of this contract; however, I credit the testimony of DiSpazio and Keane. DiSpazio confirmed his authorization in an August 16, 2000 letter to Keane. (Defendants' exhibit 2)
DiSpazio was anxious to receive his engineering study and complete the work prior to the start of school in September of 2000. The engineering study that DiSpazio was seeking was prepared by an architect, Martin A. Benassi. The Benassi report (defendants' exhibit 3) noted sagging ceiling tiles, greenish mold on ceiling tiles, and water stains on ceiling tiles. The report questions building maintenance practices and the control of humidity levels. This report was, in some respects, contrary to Amity's experts' opinions and harmful to Amity's claims in the various school litigation outlined earlier in this opinion.
At a meeting of Amity's facilities committee on August 29, 2000, Keane distributed copies of the Benassi report. Attorney Brigg's paralegal reviewed the report and, following a discussion with Attorney Briggs, all copies of the report were retrieved and turned over to Attorney Briggs. Attorney Briggs indicated to Keane that she was very upset about the existence of the report and that it would have a detrimental effect on Amity's position in litigation and would have a substantially adverse CT Page 2290 impact financially on Amity.
In early September 2000, Attorney Briggs directed Keane to schedule a meeting with DiSpazio to discuss the Benassi report. The meeting on September 12 was attended by Attorney Briggs. Eileen Miller (her paralegal) Keane, Russell Faroni (chairman of the Amity Facilities Committee) and DiSpazio.
At the September 12 meeting, Attorney Briggs asked DiSpazio to withdraw the Benassi report. DiSpazio refused, indicating that he would not participate in a "cover-up." Attorney Briggs then asked DiSpazio whether the Benassi report was a draft. He indicated it was not a draft; it was his final report. The meeting became heated and there was an angry exchange of words between Attorney Briggs and DiSpazio. The exchange included discussion of whether DiSpazio would be continuing to perform work for Amity. Attorney Briggs directed DiSpazio that he was to treat their conversation as confidential because she had shared privileged information with him. DiSpazio told Attorney Briggs to contact his attorney, Joseph Yamin.
Following that meeting, DiSpazio met with his own legal counsel, Attorney Yamin, who on that date wrote to Grignano, the Amity Director of Financial Services, describing the meeting in the following manner:
 Apparently, the School District is involved in litigation over the School's ceiling. This morning Mr. DiSpazio met with your attorney, Carol Briggs, to discuss the project. Apparently, Attorney Briggs is upset with Mr. Benassi's report and the work being performed by DiSpazio. Obviously, Mr. Benassi has identified certain safety and aesthetic issues, which DiSpazio is addressing at the school. In no way, did Mr. Benassi or Mr. DiSpazio intend to address or interfere with any issues presently being litigated. Yet, similarly, DiSpazio does not intend to instruct Mr. Benassi to modify his report nor will [he] release the report to any third person unless lawfully required to do so.
Exhibit A attached to Court exhibit 2.
In a September 12 telephone conversation between attorneys Yamin and Briggs, Attorney Briggs demanded that DiSpazio revoke or otherwise withdraw the Benassi report because the report was inconsistent with two other expert reports in her possession involving pending school CT Page 2291 litigation. Attorney Briggs also demanded that DiSpazio have Benassi draft a revised report and submit it to her for approval before submitting it to the school district. Attorney Yamin told Attorney Briggs that his client would not retract or withdraw any report.
In a letter dated September 20, 2000, Attorney Briggs wrote the following to DiSpazio Corporation and Attorney Yamin:
 Please be notified that we have been notified that the information discussed under attorney-client privilege during our meeting of September 12, 2000 has been brought anonymously to the attention of the press.
 Pursuant to Attorney Yamin's letter of September 12, 2000, we understand that "Mr. DiSpazio will not release the report to any third parties unless lawfully required to do so."
 Additionally, I made it very clear in our meeting that it was not to be discussed with anyone who was not at the meeting.
 Therefore, we need your client to confirm that he has taken and will continue to take all necessary measures to ensure his compliance with Amity Regional School District No. 5's right to confidentiality on this matter. If we do not receive such assurances by close of business today, Amity will take all necessary legal measures to protect its interests.
Defendants' exhibit 9.
On October 11, 2000, a newspaper article by correspondent Richard Weizel discussed the existence of the Benassi report and its potential damage to the Amity lawsuit. (Defendants' exhibit 11.) Following the publication of the newspaper article, counsel for Atlas and Lukmire separately requested copies of the "DiSpazio Report" and related correspondence. Attorney Briggs responded on October 12, 2000, indicating that "all unprivileged relevant documents will be disclosed in a timely manner." (Court exhibit 3.) On October 16, 2000, Atlas noticed a deposition for the keeper of records of the DiSpazio corporation for October 19, 2000, seeking the report and related correspondence and notes. Id. Attorney Briggs on October 18, 2000 filed a motion to quash and a motion for protective order to prevent the deposition from going forward. Id. Once Attorney Briggs determined that DiSpazio had no notes CT Page 2292 of the September 12, 2000 meeting, she withdrew her motions on October 20, 2000. Id. The Benassi report was subsequently made available to counsel of record in this litigation. Id.
These aforementioned factual conclusions are derived from much conflicting evidence. Attorney Briggs has maintained, for example, that she was unaware that DiSpazio was retaining an engineer (architect) to evaluate the suspended ceiling system. Her testimony, however, is contradicted by the testimony of Keane and DiSpazio. In light of the unusual extensive participation by Attorney Briggs in Amity's affairs, not only by way of its legal representation but also with respect to facilities management construction topics, I credit the testimony of DiSpazio and Keane. DiSpazio carefully documented his authorization in writing to Keane, and he was advised by Keane that Attorney Briggs needed to authorize all work. It is unlikely that he then undertook the responsibility of obtaining a study absent that authorization.
Attorney Briggs disputes Attorney Yamin's characterization of their conversation of September 13, 2000, during which Attorney Yamin claims that Attorney Briggs requested a modification or revision of the Benassi report. Attorney Yamin is a disinterested witness and his recollection is more consistent with the written record of correspondence contemporaneous with the events. Attorney Briggs maintains that she had at all times intended to provide the Benassi report as part of her regular disclosures under her discovery obligations.[6] The undisputed facts demonstrate, however, that a clearly relevant document that had been presented to Attorney Briggs on August 29, 2000 was not provided to opposing counsel until late in October 2000, and only after its existence was disclosed in a newspaper article. Attorney Briggs also characterizes her efforts to have the report withdrawn as stemming from a concern related to Freedom of Information Act requirements with respect to the disclosure of the report to the public and possible embarrassment to her client, Amity. I view such characterization as unpersuasive and self-serving.
Attorney Briggs' characterization of the events is supported in its entirety by Ms. Miller, her independent contractor paralegal. Ms. Miller testified under oath that her affidavit and that of Attorney Briggs were "independently" prepared. She further testified that any similarity between her affidavit and Attorney Briggs' affidavit was "coincidental." I find such testimony incredible, as evidenced by a few examples of the juxtaposition of the affidavits:
Miller Affidavit Paragraph 11:
"At the meeting, Attorney Briggs CT Page 2293 informed Mr. DiSpazio that Amity believed the report to be problematic because (1) the report had not been requested or otherwise authorized by Amity to her knowledge, (2) the report containedinaccurate information andassumptions about the condition,history and maintenance procedures at the high school, and (3) the report reached erroneous conclusionsabout the condition and maintenanceOf the high school. Additionally, wefeared that if the report was
revealed to press with the noted inaccuracies, it would potentially result in additional negative public attention directed to both Amity andits individual board members."
Briggs Affidavit Paragraph 18
"At the meeting, I informed Mr.DiSpazio that Amity believed thereport to be problematic because theReport (1) had not been requested orotherwise authorized by Amity, (2)contained inaccurate information andassumptions about the condition andmaintenance of the high school, and (3) reached erroneous conclusionsabout the condition and maintenanceof the high school. Additionally, I
feared that if the report, which might be subject to disclosure under the Freedom of Information Act, was revealed to the press withthe noted inaccuracies, it wouldpotentially result in additionalnegative public attentiondirected towards both Amity and itsindividual board members."
This example of the use of nearly identical wording, phrases and progression is repeated in numerous paragraphs in the Miller affidavit. (Compare Miller Affidavit, court exhibit 4, paragraphs 7, 13 and 14 with the Briggs Affidavit, court exhibit 3, paragraphs 12, 21, 19.) That such duplication would be coincidental is not believable. Considering the obvious errors in her testimony relating to the affidavits, as well as her demeanor in testifying, I decline to credit Ms. Miller's testimony.
In that the allegations of misconduct now under consideration involve an attorney's compliance with the Rules of Professional Conduct, the standard is one of clear and convincing evidence. Statewide GrievanceCommittee v. Presnick, 215 Conn. 162, 171-72, 575 A.2d 210 (1990).
 The phrase clear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. One court has suggested that clear and convincing proof is strong, positive, free from doubt and full, clear and decisive . . . The burden of persuasion, therefore, in those cases requiring a showing of clear and convincing proof is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or CT Page 2294 exist is substantially greater than the probability that They are false or do not exist.
(Citations omitted; internal quotation marks omitted.) Haymond v.Statewide Grievance Committee, 45 Conn. Sup. 481, 482-83, ___ A.2d ___ (1997), aff'd, 247 Conn. 436, ___ A.2d ___ (1999).
 Alleged Nonconformance with Rule 3.4(1)
Rule of Professional Conduct 3.4(1) demands in pertinent part that a lawyer shall not unlawfully obstruct another party' s access to evidence, or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value; nor shall a lawyer counsel or assist another person to do any such act. It is undisputed that the Benassi report constitutes "a document or other material having potential evidentiary value." The existence of mold on the ceiling tiles and the cause of its getting there remains a significant issue in all of this litigation. Practice Book § 13-15, entitled "Continuing Duty to Disclose," obligates litigating parties to supplement their compliance with discovery with any additional or new material or information previously requested. The rule specifically requires prompt notification to the other party about the existence of such information. A violation of this continuing duty to disclose under the facts as found in this case constitutes an unlawful obstruction of another party's access to evidence for purposes of Rule 3.4(1). See G. Hazard and W. Hodes, The Law ofLawyering: A Handbook on the Model Rules of Professional Conduct 626 (1994).
Attorney Briggs' admitted efforts to have the report withdrawn or treated as a draft equates with an effort to "alter, destroy or conceal." DiSpazio, to whom these efforts by Attorney Briggs were directed, characterized her request as a "cover-up." Attorney Yamin also viewed her request substantially as an effort to alter or conceal the report. it is also relevant to consider that when confronted with copies of the report at the August 29, 2000 public meeting of the facilities committee, Attorney Briggs directed that all copies of the report be collected and submitted to her control. DiSpazio also was directed after the September 12 meeting to treat their conversation as confidential. In her September 20 letter, Attorney Briggs instructed Attorney Yamin and DiSpazio to not submit the report voluntarily to anyone.
A violation of Rule 3.4(1) has been proven by clear and convincing evidence.
 Alleged Nonconformance with Rule 3.4(2)
CT Page 2295
Rule 3.4(2) requires that a lawyer shall not falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law. The allegations before the court on this misconduct issue include whether the DiSpazio Corporation may have been terminated from its contract with Amity because of its refusal to "withdraw" the Benassi report. Evidence at the hearing was insufficient to prove this allegation by clear and convincing evidence. There also was no evidence that Attorney Briggs in any way altered the Benassi report.
A violation of 3.4(2) has not been proven by clear and convincing evidence.
 Alleged Nonconformance with Rule 3.4(6)
Rule 3.4(6) mandates that a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party, unless the person is a relative or an employee or other agent of a client and the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information. On the basis of the following facts, the court finds that Attorney Briggs violated Rule 3.4(6).
There is no question that DiSpazio was not a client of Attorney Briggs or her office. Nevertheless, Attorney Briggs at the September 12, 2000 meeting directed DiSpazio to not discuss relevant information (the Benassi report) with anyone. Her instruction was confirmed in writing on September 20, 2000. (Defendants' exhibit 9.)
Attorney Briggs argues that the DiSpazio Corporation and DiSpazio as its president were agents of Amity, who is her client. Thus, she contends that the 3.4(6) prohibition is not applicable. Lukmire and Atlas dispute the characterization of DiSpazio as an agent of Amity. They contend that DiSpazio was an independent contractor employed by an agent of Amity, namely, Service Master.
Regardless of whether the DiSpazio Corporation was at any time an agent of Amity, there is no question that on September 20, 2000, DiSpazio no longer had any such relationship with Amity, because his services had been terminated effective September 12, 2000.
In an analogous provision of the Rules of Professional Conduct, Rule 4.2 restricts a lawyer's communications with persons represented by counsel. The comment to Rule 4.2 indicates that in the case of an organization, a lawyer is prohibited from communicating with certain CT Page 2296 employees of the organization. A number of authorities have held that this prohibition does not apply to former employees. See U.S. v. HousingAuthority for the Town of Milford, 179 F.R.D. 69 (D.Conn. 1997); Duboisv. Gradco Systems, Inc., 136 F.R.D. 341 (D.Conn. 1991); G. Hazard and W. Hodes, supra. at 739.
In Dubois v. Gradco, Judge Cabranas of the United States District Court for the District of Connecticut relied on Polycast Technology Corp. v.Uniroyal, Inc., 129 F.R.D. 621 (S.D.N.Y. 1990) for the proposition that "under either Rule 4.2 or its predecessor and analogue, Disciplinary Rule 7-104(A)(1) of the Code of Professional Responsibility, there is no ethical rule barring ex parte communications with a former employee of an adverse corporate party." Dubois v. Gradco, supra, 136 F.R.D. 343-44.
 [Tb the extent that Rule 4.2 and D.R. 7-104(A)(1) were formulated to preserve the integrity of the attorney-client relationship, there would be no current attorney-client relationship to jeopardize in the case of a former employee . . . . [T]here was nothing in Rule 4.2 or the Comment to justify departing from the traditional view that former employees are not encompassed within the term "party" . . . and so may be contacted without notice to the corporation's attorney . . . .
(Citations omitted; internal quotation marks omitted.) Id., 344. This analysis logically would apply equally in the context of obtaining discovery from a corporation's former agent.
The Dubois court also noted that the Rule 4.2 discussion in Polycast is consistent with that of Professor Hazard in his capacity as reporter for the ABA Commission on Evaluation of Professional Standards when the model rules were first promulgated. With respect to Rule 4.2, Professor Hazard wrote:
 This regime does not address communications with former agents and employees, and technically there should be no bar, since former employees cannot bind the organization, and their statements cannot be introduced as admissions of the organization. Speaking with the former employee therefore does not do damage to the policy underlying Rule 4.2 — undercutting or end-running an on-going lawyer-client relationship. G. Hazard Hodes, The Law of Lawyering: A Handbook on the Model Rules of CT Page 2297 Professional Conduct, 486 (1988 Supp.)
(Emphasis in original; citation omitted; internal quotation marks omitted.) Dubois v. Gradco, supra, 136 F.R.D. 344.
The Dubois court similarly relied upon Formal Opinion 91-359 of the American Bar Association Standing Committee on Ethics and Professional Responsibility on "Contact with Former Employee of Adverse Corporate Party," which explains that
 [w]hile the Committee recognizes that persuasive policy arguments can be and have been made for extending the ambit of Model Rule 4.2 to cover such former corporate employers, the fact remains that the Rule does not do so and the [C]omment gives no basis for concluding that such coverage was intended. Especially where, as here, the effect of the Rule is to inhibit the acquisition of information about one's case, the Committee is loath, given the text of Model Rule 4.2 and its Comment, to expand its coverage to former employees by means of liberal interpretation. Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.
(Internal quotation marks omitted.) Dubois v. Gradco, supra,136 F.R.D. 344.[7]
Finally, the Dubois court canvassed the state bar associations and discovered that several already had addressed the issue of contact with former employees of corporations. The court reported that all who had studied the issue agreed unanimously that no prohibition under Rule 4.2 or its predecessor D.R. 7-104(A)(1) precluded ex parte interviews of the former employees of an adverse corporate party. Dubois v. Gradco, supra, 136 F.R.D. 345 n. 4.
Moreover, this court has found that the Restatement of the LawGoverning Lawyers (2000) § 116(4) tracks Rule 3.4(6), and comments as follows:
CT Page 2298 Subsection (4) applies only with respect to those in the described relationships — a witness who is the lawyer's client in the matter or a relative or employee or other agent of the lawyer's client or the lawyer, such as an investigator or expert witness. Such a request can protect confidential information and respond to the person's special loyalty to the lawyer's client. Such a request is appropriate with respect to a former employee only if the person continues to maintain a confidential relationship with the former employer, such as an employee continuing to consult with respect to the matter involved in the representation, or if the person possesses extensive confidential information of the former employer.
Id. DiSpazio, as a miscellaneous general carpentry contractor, would not be in a position of an "investigator or expert witness." It remains Amity's position that even though DiSpazio was authorized to investigate the cause of the ceiling tile mold, that authority was given without the knowledge or approval of Amity's facilities committee. (Court exhibit 3, p. 8.) also is Amity's position that after the September 12, 2000 meeting, DiSpazio had no continuing relationship with Amity. Id. Moreover, the court was not offered any evidence suggesting that DiSpazio maintained "extensive confidential information of the former employer." It is, in fact, unlikely that he had any confidential information about Amity. The report was not confidential and is not claimed to be confidential. The only articulated claim with respect to confidentiality references instructions during the September 12 meeting concerning existing expert reports and litigation strategy. The experts' reports would not be confidential. It is also unlikely that a privilege would apply to communications with a non-client and now former "agent." By directing DiSpazio to refrain from giving relevant information to another party, Attorney Briggs violated Rule 3.4(6).
 Conclusion
Attorney Briggs requested DiSpazio, who was not her client, to refrain from voluntarily giving relevant information (the Benassi report) to anyone not connected with Amity. At the time that her request was confirmed in writing on September 20, 2000, DiSpazio was not a relative, an employee, or other agent of Amity. Attorney Briggs failed to comply with the continuing duty to disclose relevant information pursuant to Practice Book § 13-15. The court finds that her noncompliance has been proven by clear and convincing evidence as a violation of the Rules of Professional Conduct § 3.4(1) and (6). CT Page 2299
It has not been demonstrated by clear and convincing evidence that Amity School District terminated the contract of the DiSpazio Corporation in order to prevent the disclosure of the Benassi report, or otherwise in retaliation for the disclosure or preparation of such report. Any responsibility borne by Amity for the misconduct in issue would be that of a client for the conduct of its legal counsel.
The court indicated at the December, 2000 hearing that only after a determination of misconduct had been made, and the parties so notified, would it then consider evidence and argument on the sanction to be imposed. Having found that Attorney Briggs violated Rule of Professional Conduct 3.4(1) and (6), the court hereby invites the parties to submit by the close of business on February 23, 2001, a memorandum of law with respect to what sanction, if any, the court should impose. If any party wishes to introduce evidence with respect to the issue of sanctions, a proffer should be submitted with that party's memorandum of law.
SO ORDERED.
Robert F. McWeeny, J.